Shirley **KREMEN**, Carl Ross, Samuel Irving Coleman, and Sidney Steinberg, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 14359.

United States Court of Appeals Ninth Circuit.

Jan. 20, 1956.

Rehearing Denied April 20, 1956.

Denman, Chief Judge, dissented.

Gladstein, Andersen & Leonard, & Sibbett, Richard Gladstein, Norman Leonard, San Francisco, Cal., for appellants.

Lloyd H. Burke, U. S. Atty., Robert H. Schnacke, Richard H. Foster, Asst. U. S. Attys., San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and HEALY and LEMMON, Circuit Judges.

LEMMON, Circuit Judge.

A depressing tale of lies, disguises, and aliases resorted to by a group of seasoned subversives, referred to by their own attorneys as "these Communists", is unfolded by the record in this case.

It is a tale of how a handful of Reds sought to shield a convicted member of their group from condign punishment.

It is a tale of the devious practices to which they resorted in their almost successful efforts to cheat the law.

It is, finally, a tale of how their deceptions and their subterfuges were frustrated at last by the patient labors of Federal "Cossacks", as officers of the law are sometimes contemptuously called by the Reds.

With regard to the means used by "the Communists" to help a pair of their leaders to thwart justice, it is naive indeed to expect to find them hiding in alleys, skulking in twilight corners, turning up their coat collars, or pulling their hats down over their eyes.

No; the hard-core members are far too adroit and well-instructed for such amateurish cloak-and-dagger technique. They select a quiet village, rent a cabin, and then, wearing shorts, play ping-pong in their front yard. Or they add touching domestic notes, hanging up the fami-

ly wash or buying groceries at the village store.

### 1. The Indictment.

The indictment was in four counts. The first count alleged that on October 14, 1949, Robert G. Thompson was convicted in New York for conspiring to (1) organize a society for the overthrow and destruction of the Government of the United States by force and violence; and (2) advocate and teach the overthrow and destruction of the Government by force and violence in violation of Sections 2, 3 and 5 of the Act of June 28, 1940, commonly known as the Smith Act. (18 U.S.C.A. 1940 ed. §§ 10, 11, 13; 18 U.S.C.A. § 2385, 1948 revision).

It was further averred that on August 27, 1953, near Twain Harte, Tuolumne County, California, the appellants,[1] knowing that Thompson had been convicted of the above offense, "did receive, relieve, comfort and assist" him "in order to hinder and prevent his apprehension and punishment". This count was brought under 18 U.S.C.A. § 3, infra.

The second count charged that the appellants *conspired* to commit the offense charged in Count 1, and seven overt acts were set forth. 18 U.S.C.A. § 371.

The third count alleged that on August 27, 1953, the appellants Kremen, Coleman, and Rasi, also known as Ross, knowing that a warrant had been issued for the apprehension of the appellant Sid Stein, also known as Sidney Steinberg, harbored and concealed him so as to prevent his discovery and arrest, a warrant for his arrest having been issued by the United States District Court for the Southern District of New York. 18 U.S.C.A. § 1071.

The fourth count stated that the three appellants named in the third count conspired with each other, with Thompson, and with divers other persons to harbor and conceal Steinberg "so as to prevent his discovery and arrest", while those three appellants knew that a warrant for the arrest of Steinberg, under the name of Sid Stein, had been issued by the above-mentioned Court in New York on June 20, 1951. Thompson was named in this fourth count as a "co-conspirator but not as a defendant". Six overt acts were alleged. 18 U.S.C.A. § 371.

### 2. Statement of the Case.

Motions to dismiss, for discovery and inspection, for a bill of particulars, for the issuance of pre-trial subpoenas, and for a return of property seized in the raid and its suppression as evidence were made by the appellants and were denied. The District Court did, however, rule that the appellants might, on demand, have a copy of the summarized list of items seized. Such a copy was furnished them, *infra*.

After a trial starting on April 12, 1954, and lasting two weeks, during which the appellants offered no evidence, each appellant was found guilty on all counts in which he or she was charged. Judgments of imprisonment were pronounced upon all of the appellants, from which judgments the present appeals were taken.

### 3. The Appellants' Attacks Upon the Judgments of Conviction.

The following errors are asserted to have been committed by the court below, in the order in which they are discussed in the six subdivisions of the appellants' opening brief, and in the order in which they will be considered herein:

1. Sections 3 and 371 of 18 U.S.C.A. were construed and applied under the first and second counts of the indictment in a manner violative of the due process guarantees of the Fifth Amendment.

2. The search and seizure were unlawful and it was error to deny the motions to suppress.

3. The evidence is insufficient to sustain the conviction against any of the appellants.

---

1. Patricia Julia Blau was also named as a defendant in the indictment. Since the District Court granted a motion to dismiss her from the case, she does not figure in this appeal.

4. The first and second counts of the indictment do not state any offense against the United States since they do not charge Thompson with a violation of the Smith Act.

5. The trial court erred in instructing the jury.

6. The trial court erred in failing to instruct the jury as requested by the appellants.

### 4. *The Applicable Statutes.*

As we have noted in our summary of the indictment, the charges are based upon three sections of 18 U.S.C.A. as follows:

"§ 3. Accessory after the fact

"Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.

"Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by death, the accessory shall be imprisoned not more than ten years."

"§ 371. Conspiracy to commit offense or to defraud United States

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

"§ 1071. Concealing person from arrest

"Whoever harbors or conceals any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person, shall be fined not more than $1,000 or imprisoned not more than six months, or both."

### 5. *Testimony in Connection With the Motion to Suppress Evidence.*

Because of the appellants' contention that there was insufficient evidence to justify the arrests, the seizures, or the subsequent verdicts of guilty, we are attempting to give in the following two sections somewhat full summaries of the relevant testimony.

William H. Whelan, an agent of the Federal Bureau of Investigation, was in charge of the fifteen agents and the matron who participated in the arrests that took place at a certain house and its environs near the vilage of Twain Harte, on August 27, 1953, at 1:05 p. m.

The house, referred to in the record as a "cabin", was a two-story structure with a small porch on one side of it. It was on a "secondary" road, with a driveway leading from the road to the cabin itself.

The arresting party arrived in six automobiles, which drove up the roadway to the front of the house. Thompson and Steinberg were standing out in the yard. Whelan announced that he and his party were agents of the F.B.I., and that they were there to arrest them. He called upon the pair to surrender.

Thompson and Steinberg put their hands up. Agent Whelan directed them to go over to two trees in the yard, and ordered some other agents to take charge of them and search them. The two prisoners were handcuffed and were permit-

ted to sit on the ground beside one of the trees.

Whelan testified that at that time he "advised them (Thompson and Steinberg) that they were being arrested because of the warrants that were outstanding for the arrest of both of them in the Southern District of New York". He then directed the other agents to go into the house and he followed them inside. There the three persons were ordered to come outside. The men were searched, handcuffed, and seated. The young woman was searched with the help of the matron, and then was seated on a chair by the porch. Elsewhere the record indicates that Mrs. Kremen was not handcuffed.

The three prisoners who had been brought out of the house were "advised that they were being arrested by virtue of the fact that they were harboring" the two persons for whom the officers "had warrants outstanding". They were all handcuffed and searched.

The three prisoners taken from inside the house were the appellants Ross, Kremen, and Coleman. Steinberg, who was arrested outside the house, is the fourth appellant. Thompson, it will be remembered, was not made a defendant in the instant case.

The five prisoners were fingerprinted and photographed on the spot. Then they were told that they would be taken in without any more delay than was necessary, to be arraigned. In view of the fact that they would be transported to San Francisco, they were given the opportunity to pick up clothing or other articles that they might wish to take along on the trip. Each was taken to San Francisco in a separate automobile and all were arraigned in that city later the same evening.

Back in Twain Harte, the search "was completed that afternoon". Whelan had given orders that, with the exception of items of furniture, all personal property was to be taken.[2]

It was conceded that no search warrant was ever obtained. The officers were not looking for anything in particular—they were searching for "weapons, * * * contraband or anything that would be a fruit of the crime or a part of the crime". A document of 25 pages, entitled "Personal Property and Papers", which was a list of articles seized at the cabin, was introduced in evidence by the appellants. The list was prepared under Whelan's supervision.

Whelan testified that he made the decision to arrest the five persons at the cabin. This decision, made "in consultation", was that, "if a known fugitive is there, if there are others there that it can be said could be a part of the harboring process, then the others should be taken too."

The agent's weapons were drawn and directed at the appellants at the time of the arrest. The appellants "were asked for permission to allow the search to be made", but "they said nothing".

The appellants were wearing "play clothes" or "sun clothes", and there was some laundry on the line. "The whole house looked like it was lived in. There were two cars there, * * * There was food in the house."

Thompson and the appellant Steinberg were "recognized", and Agent Whelan had them "under surveillance" while they were in the yard talking together.

Whelan's first information that Kremen and her companions were at those premises was received on the afternoon preceding the raid, but he "knew it for sure that morning", within an hour or so before the arrest—at least so far as Kremen, Thompson, and Steinberg were concerned.

On cross-examination, the attorney for the appellee brought out the fact that F.B.I. agents had gone to the vicinity of

2. Later, at the trial, Roy L. Erickson, a special agent for the F.B.I., testified that "Everything was removed except that which the realtor handling the house identified as the property belonging to him."

the cabin "some time prior to the arrest", and that on the day of the raid "the first group were in the vicinity of the cabin around 6:00 a. m." Whelan himself appeared at the scene "just at the time of the arrest", but "was in contact with them by radio" from 6 a. m. until the time at which he himself appeared. The other agents reported to him "to identify persons as they came out or went in and to name them if they could."

Mrs. Thelma L. Germany testified that she and her husband owned the cabin in question and rented it that summer through "Jimmy" Morrow, a real estate broker.

Morrow, next called as a witness, stated that a "Mrs. Lee Kaplan" had approached him, expressing a desire to rent a cabin "that was secluded and quiet because her brother was ill with nerves and she wanted to be where they would be by themselves." "Mrs. Kaplan" rented the cabin in question and paid the rental monthly in advance. Morrow identified the appellant Kremen as the person who had rented the cabin. The rent was to start on June 26, 1953.

In connection with the motion to return seized property, *supra*, Agent Whelan testified that "the automobiles"[3] were returned. "They had a registered name on it and they were returned. *We never found out to this day who wants any of the rest of this property.*" The appellee's attorney stated in open court that "The automobiles were registered to people other than these defendants and we returned them."

6. *The Testimony at the Trial.*

(a) *The Reconnaissance*

Special Agent Erickson testified that on the day of the arrests he arrived in the area of the cabin at 5 a. m. He and four other agents hid behind boulders or trees on a hill above the cabin. He was in the area above the road and sometimes on the road itself. Erickson was able to observe an outhouse, *infra*, at all times.

He was about 100 feet from the cabin, and remained at his station until about 1:04 p. m.

At 9:30 a. m. a man emerged from the entrance of the cabin. The witness saw this man later in the day. The following morning, the man identified himself to Erickson in Alcatraz Penitentiary as Robert Thompson. Erickson also identified Thompson from colored and black-and-white photographs, hereinafter sometimes referred to as "Exhibit 2" and "Exhibit 3", respectively.

Thompson came out of the cabin with a fly fishing rod and practiced casting for about ten minutes. He then laid the rod on a small table in the yard and returned to the cabin.

At about 9:45 a. m. a woman came out of the cabin and sat in an armchair near the entrance. She appeared to be writing or drawing. Erickson identified the woman as the appellant Kremen. She sat in the chair for about 15 minutes and then returned to the cabin.

While Mrs. Kremen was sitting in the chair, a man dressed only in a pair of brown trousers came out of the cabin. He sat on the ground off of the lowest terrace right by the entrance from which he and the other two had emerged. He remained there for a few minutes and went back in at about the same time that Mrs. Kremen re-entered the cabin. The witness identified that man as the appellant Carl Ross.

Mrs. Kremen re-emerged at about a quarter past ten, carrying what was apparently washed clothing, which she hung on a line stretched to the outhouse from the corner of the cabin nearest to the entrance. She immediately returned to the cabin. The clothing was a man's, and there was "some type of a towel".

At about 10:30 another man came out of the cabin, walked around the yard briefly, and returned. He was dressed in only a pair of yellow swimming trunks

3. Testimony at the trial showed that there were two automobiles near the cabin, in the parking area. One was a light green Chevrolet and the other a 1950 bronze-colored Ford.

or shorts. He was identified by Erickson as the appellant Coleman.

All the four above-mentioned individuals kept walking in and out of the cabin several times. "I did not keep an accurate record of their exits and entrances."

At about noon, a fifth person came out of the cabin. He too was dressed only in a pair of trousers. Erickson identified that man as the appellant Steinberg. The latter pulled a chair up to the table and sat there, apparently writing or drawing, Erickson testified. After 15 or 20 minutes, Steinberg got up and went back into the house.

At about five minutes after 1 p. m., Thompson and Steinberg were together in the yard. Immediately before that time, all five occupants of the cabin had been sitting in the yard around the table. They appeared to be talking.

Just before 1:05, the other three returned to the house.

At about 12:45, Erickson had received certain instructions from his superior. Pursuant to those instructions he had been relaying the information that he and the other agents were "observing" to an agent in charge of the operation. Those instructions were passed along by means of a two-way radio, or "handi-talkie".

"We had been observing the people through binoculars and relaying the details as we observed them," Erickson testified. "About 12:30 we relayed the information that, to our satisfaction, two of the * * * people * * * were * * * fugitives * * *."

"About 12:45 we received instructions to stand by, not to move, but to be prepared to assist approaching party, which was approaching by automobile. We were told that there would be an arrest effected, that we would have to take the two who were there that we were satisfied were fugitives in our minds. We were told that we should also be prepared and that we would effect an arrest of all the parties there, * * *"

When the automobiles were seen coming into the entrance driveway, the officers were instructed to leave their cover positions on the upper road and on the wooded hillside and move down to the cleared area "and assist in effecting the arrest of the people of the cabin."

The F.B.I. converged upon the cabin at 1:04 p. m.

### (b) *The Attack*

When he observed the F.B.I. automobiles coming up the driveway, Agent Erickson dropped his handi-talkie and came down the wooded hillside to the parking area.

When the first car arrived, the agent in charge jumped out and "issued the command to everyone present that we were agents of the F.B.I. and that those on the premises were under arrest." The three appellants who were inside—Kremen, Ross, and Coleman—"were removed to the outside" to join Thompson and the appellant Steinberg.

Individual agents "assumed charge of the prisoners independently," according to Erickson. He personally took charge of Ross, searching and handcuffing him.

When all of the five persons had thus submitted to arrest, the agent in charge announced that there were warrants for Thompson and Steinberg, and that the officers would have to hold the others on charges of harboring.

One of the documents taken from the appellant Ross has the cryptic flavor of which American Communists are so fond:

"8/24

"Dear Jim:

"Enclosed is note to my Betty. In open envelope is some material which (I?) have written. If you care to read and comment, you are welcome. Please seal before you send off.

"The person on this end of arrangement is being instructed to break off with your lady until he makes certain other arrangements. As previously agreed, contact from

your end to be with S, with whom we are in contact. S will explain further and make necessary further arrangements.

"Regards,

"Jess"

Erickson made a thorough search of the house, which gave plain evidence of having been lived in. There was food on the two stoves, on the cabinet above the sink, in the refrigerator. There were two typewriters, a radio and a television set. Clothes were on the floor. There were brief cases and boxes filled with documents of all kinds. There also were papers in the two automobiles.

After reporting the results of his search to his superior officer, Agent Erickson was told to take the material back to San Francisco. The first search through the material was made at the house. He placed the boxes, suitcases, and the material from the two automobiles in a car that was provided for him, and went back to San Francisco with them, for a more detailed study. The appellants emphasize this taking for further study. There was nothing unlawful in this.

Before Erickson departed, the special agent in charge asked the appellants whether any of them would identify any of the material that was theirs. They all stood mute. The agent pointed out to them that up until that moment it was their privilege to say nothing. He asked them again whether they would identify anything there, or specify "anything they wanted us to take care of". The appellants remained mute. At no time did any of them tell him what was theirs. They now can hardly clamor for the return of property to which they laid no claim when they had ample opportunity to do so.

Agent Erickson identified a great mass of material taken in the raid. On cross-examination, he testified that while the officers were satisfied, from their observations through binoculars and their examinations of photographs, that two of the occupants of the cabin were fugitives, one of the agents, Joseph McCann, had previously seen the pair in person. He was sure that this was true as to Steinberg, and believed that it applied also to the other. McCann himself later testified that he had known Steinberg since November, 1950, and that he had "observed" Thompson on "numerous occasions" in New York.

Agent McCann, stationed in New York, testified that when he first saw Steinberg in November, 1950, Steinberg weighed about 165 pounds, with "a full face and a heavy build." His hair was long and black. He was about five feet six inches in height, and had a light and sallow complexion. When he saw him on the day of the raid, Steinberg weighed about 125 or 130 pounds, his hair was cut short, he was much thinner in face and body, and he had grown a mustache.

When Agent McCann "observed" Thompson in New York in 1949 and 1950, the latter was about five feet ten inches in height, weighed about 180 or 190 pounds, had *long brown* hair, and had a fairly stocky build. On the day of the raid, Thompson weighed 210 or 220 pounds, his hair was *red*—apparently dyed—and was cut *short*. He wore a *light strawberry blond mustache*. His eye-brows were *strawberry blond* also. He was very stocky in appearance, and "had a very large stomach".

A wallet was pointed out by Steinberg as belonging to him, McCann said. It contained a California Citizens Angling license, three business cards, a Social Security card, and six rent receipts. All these documents contained the name "Josh Newberg" or "Joshua Newberg". McCann testified that in his search of Steinberg's person and wallet *he found no material bearing the name "Sidney Steinberg"*. Special Agent Erickson had previously identified a Resident Citizen Fishing License, a Social Security card, and five business cards as having been found in the cabin. They likewise bore the name "Josh Newberg" or "Joshua Newberg".

Agent McCann testified that on June 20, 1951, he had a warrant of arrest to serve on Steinberg; that he first attempted to serve it on that day, at Steinberg's residence; that he was not able to serve the warrant; and that Steinberg "had not been seen" by McCann since that time, until the encounter at Twain Harte.

Glenn A. Harter, a special agent of the F.B.I., stationed at San Francisco, said that he examined the contents of Mrs. Kremen's purse at the time of the raid. Among those contents were a library card in the name of Lee Kaplan, another library card in the name of Richard Kaplan, a California resident citizen's angling license in the name of Lee Kaplan, a free campfire permit in the name of Mrs. Lee Kaplan, a Social Security card in the name of Lee Kaplan, a California Motor Vehicle Operator's License in the name of Lee Lefko Kaplan, a Pacific Gas & Electric Company bill issued to R. Kaplan; a San Jose Water Works bill bearing the name Richard R. Kaplan; and "a document saying that 'this is your invoice' to * * * Mr. Richard Kaplan * * *" Agent Harter testified the Kremen material that he examined did not reflect the name of Shirley Kremen or Mrs. Irving Kremen.

Special Agent Joseph T. Daly testified that he was at the cabin on the day of the raid and again on September 2, 1953. On the latter date, he examined ten garbage cans in a garbage container inside of the outhouse, dusting them for fingerprints. He placed scotch tape over the "latent" fingerprints that he found and sent the cans that contained fingerprints to Agent Clark in San Francisco. He identified ten Budweiser beer cans as being in the garbage cans to which he referred.

Senior Plant Quarantine Inspector Henry James Warren, of the California Department of Agriculture, stationed at Dorris, California, produced a page from his records showing that an automobile bearing the Missouri license number C–54–274, had entered the State of California at Dorris on August 20, 1953.

Frank J. Smith, special agent for the F.B.I. at New York, said that he had known Thompson from 1949 to the time of the trial, and that the latter's appearance on August 27, 1953, when Smith arrested him, was "not at all" the way he looked four years before. In 1949 Thompson had dark brown hair, which he wore much longer than at the time of his arrest. When picked up at Twain Harte, at which time Thompson's picture was taken, he had a "crew cut", his hair was dyed red, he wore a reddish mustache, and his eyebrows were red. His complexion was "a brown".

"When I knew him in the past," Agent Smith continued, "he had an apparently sallow complexion. He wasn't the color he was at the time we saw him.

"He weighed about 41 pounds heavier on August 27, 1953, than he had when I saw him prior to that, which was about May 1st, 1951. He had a definite stomach, quite a large stomach, which he didn't have before. He was a husky built fellow, but he was quite fat in this picture here."

Between the time that he first saw Thompson and May, 1951, Smith testified that he "must have seen Thompson several hundred times". He saw Thompson at the Communist Party headquarters, and at about the time of the trial in New York.

At first Thompson wouldn't say anything to him, Smith testified. When fingerprinted, Thompson denied his identity, but would not "talk about who he was". In a coat that belonged to a suit that Thompson admitted was his, there was found a certificate of birth stating that John Francis Brennan" was born in New York on April 9, 1909.

Another exhibit was a book containing a $100 initiation stamp and certifying that "Brennan" had been granted membership in the International Association of Bridge, Structural and Ornamental Iron Workers, affiliated with the American Federation of Labor.

Smith also identified a wallet found in the khaki trousers that Thompson was wearing. A sheaf of papers found inside the wallet was also introduced in evidence. These papers bore the name of "John Brennan" or that of "Linda Corsia Brennan." Smith testified that "there was nothing in his wallet or on his person with the name of Robert G. Thompson at all."

Later, in San Francisco, Thompson admitted to Smith that the wallet and the papers in it were his. He finally said to Smith, "Well, I guess you know who I am," and signed a "listing" of the money, the wallet, and a penknife that had been taken from him. He signed as "Robert Thompson".

Albert B. Ground, a fingerprint examiner for the F.B.I., with headquarters in Washington, was the next witness. He testified that he had examined "approximately 5,000,000" of the 130,000,-000 fingerprints in the F.B.I. files. He said that he had examined the ten Budweiser beer cans already referred to, and had found thereon the fingerprints of each of the four appellants, as well as that of the alleged co-conspirator Thompson.

John Lautner, a consultant with the Department of Justice, testified that for twenty years prior to January, 1950, except for the time when he was in the Army, he had been employed as a functionary of the Communist Party. When the appellee's attorney sought to inquire as to Lautner's specific function in the Party, counsel for the appellants objected that there was "no foundation". The answer of the District Judge was so apposite to many other similar objections by defense counsel that it bears quoting here:

"* * * counsel can't put in all the evidence in one instant of time."

Lautner had been head of the New York State Review Commission, security officer of the New York State Organization, and a member of the National Review Commission, all of the Communist Party. He testified that he was ac-quainted with the appellants Ross, Coleman, and "Stein" (Steinberg).

Lautner knew Steinberg from 1948 up to the time that the former left the Party, on January 17, 1950. Steinberg's New York office was at the Communist Party headquarters, in the same building where Lautner himself had had his offices.

Thompson had his headquarters in the "national office" of the Communist Party from about 1944 to the time that Lautner left the Party.

Coleman had his offices there from May, 1947, up to the summer of 1949, when Lautner himself acquired an office in the building. He saw Coleman in the presence of Thompson many times, from the summer of 1947 up to the end of 1949, at the state headquarters of the Party. He also saw them at the Party's state convention, at Webster Hall, New York.

The witness said that he had seen Steinberg and Ross in the presence of Thompson, and that he had seen Steinberg in the presence of Ross at the 1948 national convention of the Party. Coleman was present at the state convention. Thompson was present at both conventions.

In connection with his duties in the Communist Party, Lautner had occasion to work with Coleman, Steinberg, and Thompson.

Thompson, as state chairman of the Communist Party, was Lautner's superior in the New York State organization, and also as member of the National Committee Thompson was his superior officer. This was their status from 1945 to December, 1950.

Lautner and the appellant Coleman were both members of the New York State Organization Commission, Coleman being a member of the educational department and head of the review commission. This party relationship of the two men continued from May, 1947, to about the middle of 1949.

Burnett Britton, another F.B.I. special agent, testified that he visited the area

of the Twain Harte cabin at 2:35 p. m. on August 26, 1953,—the day before the raid. His car came to about five yards of the cabin and stopped. He saw Mrs. Kremen standing at the door, while two men, whom he identified as Coleman and Thompson, were playing Ping-pong at a table in the parking area south of the cabin. Thompson was again described as having "strawberry blond" hair.

Britton said that he noticed a light-green Chevrolet coupe in the parking area. Later that day, at 4:15 p. m., he saw Mrs. Kremen driving the same automobile "extremely slowly" in the main thoroughfare of Sonora, California, which is about fourteen miles from the village of Twain Harte.

At midnight of the same day, Britton again visited the cabin premises, and again at 3 a. m., the following day, August 27, and, finally, with the raiding party at 1:05 p. m. At that final visit, he observed two automobiles at the cabin, one of them being the 1950 green Chevrolet coupe.

On cross-examination, Britton stated that on his visit to the cabin premises in the afternoon of August 26, the car in which he was riding was being driven by Robert Summers, an employee of the Pacific Gas & Electric Company, whom Agent Britton had picked up at Sonora three-quarters of an hour before. The automobile stopped at the entrance of the house for about three minutes. Britton remained in the car, but Summers approached Mrs. Kremen. After three minutes Summers returned to the car, and the two men drove off.

Woodrow Walton, a salesman for a Hudson automobile agency at St. Louis, Missouri, testified that he sold a Hudson to a man whom he identified as Samuel Coleman, one of the appellants, on June 5, 1953. Coleman traded in an Olds automobile, signing the necessary papers with the name "William B. Gordon". Coleman kept the license number of his old car and used it on his new Hudson, which is in accordance with Missouri practice. The license number was C54274.

Walter C. Donner, of Camdenton, Missouri, owner and operator of a motel and cottages, identified Coleman as a man who stayed at one of his cottages for two days during the Memorial Day weekend in 1953. Coleman was accompanied by one man and two women. At this juncture counsel for the appellants again objected and the Court, as we have noticed before, remarked, "He has to start somewhere." Counsel for the appellee withdrew his question about the gender of the party, but a moment later developed the information that one of the persons with Coleman was a man, and that there were three persons with him altogether. Donner testified that he arranged for a boat for Coleman, who returned on July 4 and 5 with his same party and took a cabin there again for two days.

Odie E. Meyers, operator of "a fishing dock or boat resort" at Camdenton, testified that a man whom he identified as Coleman accompanied by a "lady" came to the Meyers dock during the Memorial Day weekend and made reservations for two boats for the July 4 holiday.

During the July 4 holiday four persons were in the Coleman party. Coleman used the name "Gordon". The man with him had hair with a "grayish reddish cast". Meyers identified the two photographs of Thompson as being pictures of the man he saw with Coleman at the boat dock. Coleman and Thompson were together at the boat dock during the three days that the party was there.

Some time after the visits of the Coleman party, some F.B.I. agents asked for the boat resort's registrations "for that particular day", or the July 4 holidays. The Government men came back and forth to the dock on as many as ten occasions, each time bringing photographs that Meyers and his wife were asked to identify as being of persons who had been there.

The first time that Thompson's picture was in a group photograph that was

shown to Meyers and his wife, they "selected it", Meyers testified. The couple picked out "only two photographs altogether"—Coleman's and Thompson's. The first time the officers visited the fishing dock, Mr. and Mrs. Meyers were shown a photograph of "Gordon" (Coleman), and "the next time they brought back those photographs, why, he had apparently been apprehended and the photo was in cuffs." During the various visits, the officers showed the couple about four or five different photographs of Thompson and they "picked (him) out each time". Defense counsel himself brought out, on cross-examination, that Meyers "did not know before (he) got on the witness stand" that he was going to be asked to identify Exhibits 2 and 3.

Harold G. Anderson, a merchant of Bigfork, Montana, with authority to issue Montana fishing licenses, identified Exhibits 2 and 3 as being photographs of a man that represented himself as being "J. F. Brennan" and to whom a fishing license was issued, on August 10, 1953. A person giving the name "Linda Brennan" was present at the time.

E. M. Spencer, owner of some cabins near Polson, Montana, about thirty miles from Bigfork, identified Exhibits 2 and 3—the Thompson photographs—as being photographs of "J. F. Brennan", a "heavy-set man" with "pink colored hair", who stopped to fish at one of Spencer's cabins for the week commencing August 10, 1953. "Brennan" was accompanied by the appellant Coleman and some other persons. The party arrived at Spencer's property in a light blue Hudson automobile bearing a Missouri license. Spencer's record of the transaction showed "Brennan's" address as being St. Louis.

Dr. Isaac Rosenstein, of Brooklyn, New York, said on the stand that Coleman in 1949 occupied one of Dr. Rosenstein's apartments on East Broadway in New York. So far as the doctor knew, Coleman still occupied the apartment, together with Mrs. Coleman and their two children, although the witness had not seen Coleman himself on the premises for "several years" prior to November, 1953.

Mrs. Audrey Hanson, of Minneapolis, Minnesota, said that the appellant Ross, Mrs. Ross, and their daughter, had resided next door to her since about 1946, but that in the latter part of 1950 Ross "had moved away", and she had not seen him until "he was captured in California" in the fall of 1953.

James Morrow, the Twain Harte real estate broker that, as we have seen, was a witness at the hearing of the motion to suppress evidence, testified at greater length at the trial itself. He went into some detail concerning the lies that the appellant Kremen told him regarding her reasons for wanting to rent the cabin in question. He said that Mrs. Kremen, who represented herself to him as being "Mrs. Lee Kaplan", stated that her "brother" was "sick with nerves", that he was a "musician", and that she liked the cabin because "there was a stream there and it was very quiet".

The appellant Kremen's story to Morrow was false, from beginning to end. She used an assumed name. She was not renting the cabin for a sick brother, who was a musician. She did want "a spot where it would be quiet and rather secluded". She did not want it, however, for a nervous brother, but for a brace of "nervous" fugitives!

Apparently realizing that Morrow's testimony was damaging, especially to the appellant Kremen, counsel for the defense conducted a lengthy cross-examination, covering 30 pages of the printed record, although the direct examination required only eight pages. The District Judge recognized that the cross-examination had "come to the point of badgering", and gave defense counsel five additional minutes in which to complete his questioning.

Charles E. Germany, owner of the cabin in question, said on the stand that the appellant Steinberg introduced himself to the witness as "Newberg" and presented the appellant Kremen as "his sister". On the occasion of Mr. and Mrs.

Germany's visit to the cabin, the appellant Kremen was "dusting the furniture or something around the house".

After leaving the cabin, Mr. and Mrs. Germany visited some neighbors. When they returned to their car, they saw Steinberg and Kremen playing Ping-pong.

About a month later, Germany alone visited the cabin again to collect the light bill. He saw an "extra man" there at that time. Steinberg, who seemed to act as the master of the household, introduced the man as a "buddy" of his, and motioned to Kremen to pay Germany for the light bill. She obeyed. Ross was identified by Germany as the "extra man" he saw at the cabin at that time.

Mrs. Ruth Lackey, who helps her husband in their general store in Twain Harte, "very definitely" identified Mrs. Kremen as a shopper in the store, "buying a fairly large order". She also identified the appellant Steinberg, but remarked, that "he didn't look like he does now. He had a mustache."

Mrs. Roger Butler, whose husband is an electrical contractor, said that Mrs. Kremen came to her house to get Butler to repair the cabin pump, since "They had no water in the house". Mrs. Kremen gave Mrs. Butler two keys and asked the latter to have her husband come out to do the repair job. Ten or fifteen minutes later, Kremen went back to the house and asked for the keys back. "She thought she might fix the pump herself," but according to Mrs. Butler, "She said she wanted him to come out when he arrived". Apparently Mrs. Kremen thought better of turning over the keys to the Communist hideout, even to an electrical repairman!

Butler himself then took the stand and identified Mrs. Kremen as being present when he did some work at the cabin in August, 1953.

Dorothy Henrichsen, co-proprietor with her husband of a sports shop in Twain Harte, said that the appellants Kremen and Steinberg visited the shop in June or July, 1953, in company with "another gentleman". In identifying Steinberg, the witness, like Mrs. Lackey, remarked that "he had a moustache at the time".

The trio came in to buy a pair of swim trunks "for a friend that was ill at the time". The witness said that she tried to discourage them from taking the trunks "without the party being able to try them on, because there is no return or refund on swimming clothes". She described the second male customer as "tall, rather obese, (with) very ickey red hair and moustache, and * * * (not) a bit good looking". From Exhibits 2 and 3, the witness identified the second customer as Thompson.

Later, Mrs. Kremen went back to the store to return the trunks "because they wouldn't fit". Mrs. Henrichsen "wouldn't exchange them or give her her money back, and so she didn't care much for me after that. She went to my husband after that."

On cross-examination, Mrs. Henrichsen said that she also saw Coleman with Thompson, on the street. In other words, she saw Kremen, Steinberg, Coleman, and Thompson on the streets of Twain Harte.

The Henrichsens ordered Ping-pong balls for Mrs. Kremen, but they arrived after the appellants' arrest.

Glenn F. Ellis, of Danville, California, employed in a stationery firm of Oakland, California, identified the appellant Ross as the purchaser of a duplicating machine and supplies on June 28, 1953, at the Oakland shop. Ross used the name "Newman" on that occasion, Ellis said. Two invoices, exhibits in the case, covering Ross's purchases, referred to him as "R. E. Newman", and gave his address as "201 Oak Street, Redding".

Harry L. Sotzien, a butcher in Lackey's grocery store, supra, testified that he filled an order for sour cream and frequent orders for "good cuts" of meat— the "best" he had—from a woman he identified as the appellant Kremen, in the summer of 1953. Some of the orders were of "great size", the meat purchases

"ranging from four to twelve or fifteen dollars". Mrs. Kremen was the only purchaser of sour cream during that time, and it had to be ordered especially for her.

Phillip J. Moody, owner of a Shell service station at Santa Cruz, California, identified a "lubrication chart" showing that a 1950 five-passenger "metallic brown" Ford tudor coupe had been brought in on August 16, 1953, and identified the appellant Kremen—"The lady in red"—as the one that had brought in the car for servicing.

7. *Sections 3 and 371 of Title 18 Were Not Construed or Applied By the Court Below in a Manner Violative of the Due Process Guarantees of the Fifth Amendment.*

In their very first and basic statement with regard to the District Court's construction and application of the Fifth Amendment of the Constitution, the appellants have fallen into palpable error. They assert that "The crime of accessory after the fact, after conviction of the principal, was not recognized at common law".

In Bishop on Criminal law, 9th ed., twice cited as an authority by the appellants, we find the following statement in Volume 1, Sec. 697, pages 500–501:

"One mode of helping a felon is to rescue him from the lawful confinement, *either before or after his conviction;* and the rescuer may be indicted for the substantive offense of rescue, *or for being an accessory after the fact in the other's felony, at the election of the prosecutor.* The theory on which the prosecution proceeds differs a little in two forms, but not essentially." (Emphasis supplied.)

But even if such had not been the rule under the common law, Congress had the undoubted power to enlarge the definition of accessory after the fact.

Accordingly, the argument of the appellants that "Section 3 was not intended to be applied in instances where the aid was rendered after conviction" is wholly without merit.

Nor can we agree with their contention that "Evidence is wholly lacking of the existence of two separate and distinct agreements (one to "assist" Thompson and the other to "harbor" Steinberg)," or that "If there was any conspiracy at all in this case, which appellants stoutly deny, it was a single conspiracy to aid fugitives who were Communists."

From our careful study of the evidence, which has been fully outlined, supra, and which will be discussed hereinafter, we are convinced that there was substantial evidence to support "The finding of two separate and distinct agreements".

There was here no "stretching and tailoring of the accessory after the fact statute in a manner which violates the due process guaranties of the Fifth amendment". The appellants were "accessories after the fact" *quoad* Thompson, in that they sought to "hinder or prevent" his *punishment* after his *conviction.* *Quoad Steinberg,* they were merely "concealing" him from *arrest.*

Section 3 *alone* refers to shielding from *punishment:* Section 1071 stops short of *that,* and concerns itself merely with the offense of shielding a person from "discovery and arrest".

The appellants' objections to the application of Section 3 and 371 are without validity.

8. *The Search and Seizure Were Lawful, and the District Court Did Not Err in Denying the Motions to Suppress.*

▋ The testimony in connection with the motions for the return of seized property and its suppression as evidence has been fully summarized *ante.* It would be a work of supererogation to repeat that summary here.

Suffice it to say, Morrow, the real estate broker, testified that the appellant Kremen, alias "Mrs. Lee Kaplan", rented the cabin through him, giving out the now-familiar story of the apocryphal

"brother" suffering from "nerves". Special Agent Whelan told how F.B.I. agents had been observing the cabin from six o'clock that morning to R-hour (raid hour), or 1:05 that afternoon. The agents observed all the appellants and their co-conspirator Thompson coming out of the cabin and re-entering it. About 30 or 45 minutes before the arrest, the officers knew "for sure" that the admitted "bail jumper" Thompson was one of the cozy Commie coterie, which turned out to be well-nurtured with New York steaks. Within an hour before the arrest, Agent Whelan "verified" Steinberg's presence in the premises.

The appellants apparently had spent the night at the cabin, since the F.B.I. men did not see any one enter the house since the dawn's early light, when the occupants began to emerge.

It is hornbook law that officers have the right to arrest without a warrant when a felony is being committed in their presence. They *knew* that Thompson and Steinberg were fugitives from justice. They had reason to believe that all the appellants were harboring Thompson and that the appellants Kremen, Ross, and Coleman were harboring the appellant Steinberg.

It is likewise elementary that officers have a right, as an incident to a valid arrest, to search the place where the arrest is made.

We advert now to the *reasonableness* of the search.

For a proper understanding of this phase of the case, it is necessary to glance a moment at the prior record of the co-conspirator Thompson and the appellant Steinberg, in connection with violations of the Smith Act.

At the outset, it should be borne in mind that the appellants themselves concede that "Steinberg was indicted in 1951 for the same offense of which Thompson was convicted in 1949". Let us briefly examine the record of that indictment and that conviction.

Thompson was convicted in the United States District Court in New York, and his conviction was affirmed by the Second Court of Appeals on August 1, 1950. United States v. Dennis, 2 Cir., 183 F. 2d 201. The Supreme Court affirmed on June 4, 1951. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. Thompson was admitted to bail pending the Supreme Court's review of decision of the Court of Appeals, 2 Cir., 184 F.2d 280, and he absconded after an order on mandate had been entered by the District Court directing him and others who had been convicted with him, to surrender on July 2, 1951, to the United States Marshal in New York City. He never did surrender but, as we have seen, was arrested at Twain Harte. See Williamson v. United States, 2 Cir., 1950, 184 F.2d 280, opinion by Mr. Justice Jackson, acting as Circuit Justice, who extended Thompson's bail pending certiorari; and United States v. Thompson, 2 Cir., 1954, 214 F.2d 545, affirming United States v. Thompson, D.C.N.Y.1953, 117 F.Supp. 685, which was a judgment of criminal contempt against Thompson, handed down by the United States District Court for the Southern District of New York, based on Thompson's failure to respond to a surrender order. In that criminal contempt case, certiorari was denied, 1954, 348 U.S. 841, 75 S.Ct. 48, 99 L.Ed. 663.

In the words of appellants' counsel, Thompson was a "bail jumper", and at the time of his arrest in California "he was punishable not only as one who had been convicted of a crime but also as one who had failed to surrender in obedience to a court order".

Steinberg, under the name of Sidney Stein, had been indicted in the United States District Court for the Southern District of New York for conspiracy to violate the Smith Act, and on June 20, 1951, a bench warrant was issued for his arrest.

At the time of the arrests, Agent Whelan informed both Thompson and Steinberg "that they were being arrested because of the warrants that were out-

standing for the arrest of both of them in the Southern District of New York."

Against this factual background relative to the court history of the appellant Steinberg and the co-conspirator Thompson, and their sojourn at the cabin in the company of the appellants Kremen, Coleman, and Ross, their comrades, the legal relationship of the quintet becomes reasonably clear.

This legal relationship will be developed more fully hereinafter, in considering the specified error relating to the alleged insufficiency of the evidence to support the verdicts. For the time being, we need only point out that the agents had observed the appellants actually "assisting" Thompson, apparently to "hinder and prevent" his "apprehension and punishment".

The F.B.I. officers had reasonable cause to believe that a felony was being committed in their presence. They did not need then to be in possession of all the facts.

The officers likewise had the right, incidental to a valid arrest, to search the place in which the arrest was made. Nor is the mere quantity of material taken objectionable, provided that the arrest was valid and the search made thereunder was reasonable. Mere quantity of material seized does not make the search unreasonable.

In Harris v. United States, 1947, 331 U.S. 145, 148–155, 67 S.Ct. 1098, 1101, 91 L.Ed. 1399, heavily relied upon by the appellants themselves, two valid warrants of arrest were issued, one charging a violation of the Mail Fraud Statute and the other alleging a crime arising under the National Stolen Property Act. Five F.B.I. agents arrested the suspect and searched his apartment, consisting of a living room, bedroom, bathroom, and kitchen. The agents stated that the object of their search was to find two canceled checks that were thought to have been used in effecting a forgery involved in the charges *set forth in the warrants of arrest.*

The conviction appealed from, however, was on sixteen counts of an indictment charging violations of the *Selective Training and Service Act of 1940 and Sec. 48 of the Criminal Code as it then stood* (35 Stat. 1098, 18 U.S.C. Sec. 101 (1940 et.)), relating to the receipt, etc., of property stolen from the United States.

As the search neared its end, one of the agents discovered an envelope containing eight "Notice of Classification" cards and eleven Registration Certificates. It was that evidence upon which the conviction *for violation of the Selective Training and Service Act was based, and it was conceded that the evidence was in no way related to the crimes for which the prisoner was initially arrested and that the search which led to its discovery was not conducted under the authority of a search warrant.*

In an opinion affirming the conviction, Mr. Chief Justice Vinson said:

"This Court has also pointed out that it is only *unreasonable* searches and seizures which come within the constitutional interdict. The test of reasonableness cannot be stated in rigid and absolute terms. 'Each case is to be decided on its own facts and circumstances.' [Case cited.]

"The Fourth Amendment has never been held to require that every valid search and seizure be effected under the authority of a search warrant. Search and seizure incident to lawful arrest is a practice of ancient origin and has long been an integral part of the law-enforcement procedures of the United States and of the individual states.

"The opinions of this Court have clearly recognized that the search incident to arrest may, under appropriate circumstances, extend beyond the person of the one arrested to include the premises under his immediate control. Thus in Agnello v. United States, supra, 269 U.S. [20] at page 30, 46 S.Ct. [4] at page 5, 70

L.Ed. 145, it was said: 'The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody is not to be doubted.' It is equally clear that a search incident to arrest, which is otherwise reasonable, is not automatically rendered invalid by the fact that a dwelling place, as contrasted to a business premises, is subjected to search.

"Nor can support be found for the suggestion that the search could not validly extend beyond the room in which petitioner was arrested. Petitioner was in exclusive possession of a four room apartment. His control extended quite as much to the bedroom in which the draft cards were found as to the living room in which he was arrested. The canceled checks and other instrumentalities of the crimes charged in the warrants could easily have been concealed in any of the four rooms of the apartment. * * * the area which reasonably may be subjected to search is not to be determined by the fortuitous circumstance that the arrest took place in the living room as contrasted to some other room of the apartment.

"Similar considerations are applicable in evaluating petitioner's contention that the search was, in any event, too intensive [as contended in the instant case]. Here again we must look to the particular circumstances of the particular case. * * *

"Nor is this a case in which law enforcement officers have entered premises ostensibly for the purpose of making an arrest but in reality for the purpose of conducting a general exploratory search for merely evidentiary materials tending to connect the accused with some crime. * * * In the present case the agents were in possession of facts indicating petitioner's probable guilt of the crimes for which the warrants of arrest were issued. * * *

"In keeping the draft cards in his custody petitioner was guilty of a serious and *continuing offense against the laws of the United States. A crime was thus being committed in the very presence of the agents conducting the search. Nothing in the decisions of this Court gives support to the suggestion that under such circumstances the law-enforcement officials must impotently stand aside and refrain from seizing such contraband material. If entry upon the premises be authorized and the search which follows be valid, there is nothing in the Fourth Amendment which inhibits the seizure by law-enforcement agents of government property the possession of which is a crime, even though the officers are not aware that such property is on the premises when the search is initiated.*

" * * * we should not permit our knowledge that abuses sometimes occur to give sinister coloration to procedures which are basically reasonable." (Emphasis supplied.)

In United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, the defendant was convicted of selling and of possessing and concealing forged and altered obligations of the United States with intent to defraud. The question there presented involved the reasonableness of a search without a search warrant of a place of business consisting of a one-room office, the search being incidental to a valid arrest.

A printer who possessed plates for forging "overprints" on canceled stamps was taken into custody. He disclosed

that the defendant, a dealer in stamps, and an old offender, was one of the customers to whom he had delivered stamps bearing forged overprints. A postal employee was sent to the defendant's place of business to buy stamps bearing overprints. He bought four stamps, which were sent to an expert to determine whether the overprints were genuine. A report was received that the overprints were forgeries, though the stamps themselves were genuine. The overprints had been placed upon the stamps after cancellation, and not before, as was the Government's practice. A warrant for the defendant's arrest was obtained.

Armed with this warrant, Government officers and two stamp experts went to the defendant's place of business, a one-room office open to the public. The defendant was arrested, and over his objection the officers searched the desk, safe and file cabinets for about an hour and a half. They seized 573 stamps, on which it was later determined that overprints had been forged.

The defendant was indicted on two counts, one charging the sale of four forged and altered stamps, and the second alleging that the defendant had possessed and concealed, with intent to defraud, the 573 forged and altered stamps.

The question there was whether the 573 stamps, the fruits of the search, were admissible in evidence. The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

In restricting the ambit of the Fourth Amendment, the Supreme Court said:

"It is unreasonable searches that are prohibited by the Fourth Amendment. [Case cited.] It was recognized by the framers of the Constitution that there were reasonable searches for which no warrant was required. The right of the 'people to be secure in their persons' was certainly of as much concern to the framers of the Constitution as the property of the person. Yet no one questions the right, without a search warrant, to search the person after a valid arrest. * * *

" * * * Even if the warrant of arrest were not sufficient to authorize the arrest for possession of the stamps, the arrest therefor was valid because the officers had probable cause [as in the instant case] to believe that a felony was being committed in their very presence. [Case cited.] * * *

"The right 'to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed' seems to have stemmed not only from the acknowledged authority to search the person, but also from the long-standing practice of searching for other proofs of guilt within the control of the accused found upon arrest. [Case cited.] It became accepted that the premises where the arrest was made, which premises were under the control of the person arrested and where the crime was being committed, were subject to search without a search warrant. Such a search was not 'unreasonable.' " [Cases cited.] At pages 60 and 61 of 339 U.S., at page 432 of 70 S.Ct.

The Court then quoted at some length from Marron v. United States, 1927, 275 U.S. 192, 199, 48 S.Ct. 74, 72 L.Ed. 231, in which the following pertinent statement is found:

" 'The authority of officers to search and seize the things by which the nuisance was being maintained extended to all parts of the premises used for the unlawful purpose.' "

(Emphasis supplied.) At page 62 of 339 U.S., at page 433 of 70 S.Ct.

The appellants assert that "searches without search warrants are condemned unless they fall within two narrow classes"; namely, where the searches are "incident to a valid arrest" (as here) or in "special circumstances". Continuing, the appellants complain as follows:

"* * * the arresting officers were confronted by no emergency * * * The preparations made for at least two days prior to the arrest demonstrate without question that the officers could easily have applied for warrants—and without in any way interfering with their handling of the case."

The appellants quote extensively from the case of Trupiano v. United States, 1948, 334 U.S. 699, 708, 68 S.Ct. 1229, 1234, 92 L.Ed. 1663, including the following sentences:

"A search or seizure without a warrant as an incident to a lawful arrest has always been considered to be strictly limited right. *It grows out of the inherent necessities of the situation at the time of the arrest. But there must be something more in the way of necessity than merely a lawful arrest.*" (Emphasis supplied.)

The appellants' reliance upon Trupiano is unfortunate; for that case has been specifically overruled by the Supreme Court itself on the very point that we are here discussing; namely, the "inherent necessities of the situation at the time of the arrest". In United States v. Rabinowitz, supra, 339 U.S. at pages 64–66, 70 S.Ct. at page 434, the Court said:

"Assuming that the officers had time to procure a search warrant, were they bound to do so? We think not, because the search was otherwise reasonable, as previously concluded. In a recent opinion, Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, this Court first enunciated the requirement that search warrants must be procured when 'practicable' in a case of search incident to arrest. * * *

"A rule of thumb requiring that a search warrant always be procured whenever practicable may be appealing from the vantage point of easy administration. But we cannot agree that this requirement should be crystallized into a *sine qua non* to the reasonableness of a search. It is fallacious to judge events retrospectively and thus to determine, considering the time element alone, that there was time to procure a search warrant. Whether there was time may well be dependent upon considerations other than the ticking off of minutes or hours. The judgment of the officers as to when to close the trap on a criminal committing a crime in their presence or who they have reasonable cause to believe is committing a felony is not determined solely upon whether there was time to procure a search warrant. Some flexibility will be accorded law officers engaged in daily battle with criminals for whose restraint criminal laws are essential.

"It is appropriate to note that the Constitution does not say that the right of the people to be secure in their persons should not be violated without a search warrant if it is practicable for the officers to procure one. The mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches. It is not disputed that there may be reasonable searches, incident to an arrest, without a search warrant. Upon acceptance of this established rule that some authority to search follows from lawfully taking the person into custody, it becomes apparent that such searches turn upon the reasonableness under all the circumstances and not upon the practicability of procuring a search warrant, for the warrant is not required." (Emphasis is the Supreme Court's.)

Addressing its attention once more to Trupiano, the Supreme Court continued:

"To the extent that Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, requires a search warrant solely upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, that case *is overruled. The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case.*" (Emphasis supplied.)

Without laboring this point further, we hold that, both on reason and on authority, and "in the total atmosphere of the case", the search and seizure in the instant case did not violate the Constitution.

9. *The Evidence Was Sufficient to Support the Conviction of Each of the Appellants.*

 In the first place, the appellants complain that, "while the indictment charges that Thompson had been convicted of conspiring to organize a society for the overthrow of the government by force and violence, the proof was that Thompson had been convicted of conspiring to organize a society to 'teach and advocate' the forcible overthrow of the government".

The recital in the indictment that Thompson was convicted in the United States District Court in the City of New York did not state an issue in the present case. That Thompson was convicted is both undisputed and indisputable. The District Judge instructed the jury:

"Now, with reference to that first count of the indictment, let me say to you that you need not examine the facts or the record presented to determine whether or not Robert Thompson committed the crime therein described, because I now tell you and instruct you as a matter of

law that the record shows that Thompson was convicted of the said crime in a United States court, and that judgment was pronounced against him and has become final. Consequently, Thompson did commit the crime of conspiring to teach the overthrow and destruction of the United States Government by force and violence."

Actually, the technical charge of which Thompson was convicted was "conspiring to organize the Communist Party of the United States as a group to 'teach and advocate the overthrow and destruction' of the government 'by force and violence,' and 'knowingly and wilfully to advocate and teach the duty and necessity of overthrowing and destroying' the government by 'force and violence.'" United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, 205, affirmed, 1951, 341 U.S. 494, 517, 71 S.Ct. 857, 95 L.Ed. 1137.

An inartificiality in pleading, *by way of recital* in an indictment, of the conviction of an individual who is not even a defendant in the case at bar, cannot be tortured into being a basis for reversible error in failure of proof. Neither could incomplete language in a trial judge's instructions be thus magnified.

The full story of Thompson's conviction and "bail-jumping" is stated in the appellants' own opening brief. There is no merit to their technical objection that "The conviction of Thompson as charged here was not proved".

Finally, the appellants urge that "There was insufficient evidence of knowledge" of the identity of Thompson and Steinberg, and that "There was insufficient evidence of acts of assistance".

Here again, as in the case of the evidence relative to the search and seizure, we have already summarized the appellee's showing on the facts to so ample an extent that it would be superfluous to repeat that summary here. It might be helpful, however, to review briefly a few of the high lights:

### (a) *Steinberg*

F.B.I. Agent McCann had known Steinberg since November, 1950. He testified that a wallet, pointed out by Steinberg as belonging to him, contained a fishing license, three business cards, etc., all containing the name "Newberg", but no material bearing the name "Steinberg". Special Agent Erickson had previously testified that certain papers found in the cabin likewise bore the name "Newberg". John Lautner, the former high official in the Communist Party, had been acquainted with Steinberg, as well as with Ross and Coleman, for several years, and had occupied offices in the same Communist Party headquarters in New York in which Steinberg and Coleman had their offices. He saw Steinberg in the presence of Thompson at the 1948 National Convention of the Party.

Steinberg seemed to be the head of the household in the cabin.

### (b) *Ross*

One of the papers taken from Ross was a mysterious note to one "Jim", containing the "hush-hush" references so frequently found in subversive epistolary literature. Two invoices covering Ross's purchases of a duplicating machine and supplies at an Oakland store showed that he used the name "R. E. Newman" and gave Redding as his address. Lautner saw Ross in the presence of Steinberg at the 1948 National Convention of the Communist Party. He also saw Ross in the presence of Thompson.

### (c) *Coleman*

This Communist was present at the 1948 New York State convention of the Party, which Thompson attended. Coleman was in the presence of Thompson "numerous times" at the Communist Party headquarters. In connection with his duties in the Party, Lautner had occasion to work with Coleman, who, like Lautner, was a member of "the New York State Organization Commission". On June 5, 1953, nearly three months before the Twain Harte raid, Coleman traded in an Olds automobile for a Hudson at St. Louis, signing the name "Gordon" to the necessary papers. During the July 4 holiday that same year, Coleman and Thompson were members of a party of four that rented two boats at a "fishing dock or boat resort" in Camdenton, Missouri.

### (d) *Kremen*

Mrs. Shirley Kremen, alias Lee Kaplan, alias Lee Lefko Kaplan, proved herself to be the most accomplished fictionist of the lot. Her fabrications were worthy of Mark Twain and Bret Harte, the two writers after whom the picturesque Tuolumne hide-out was probably named. Although the record is silent as to this latter point, it is far from silent regarding Mrs. Kremen's fecund imagination. Special Agent Harter examined the contents of her purse at the time of the raid. He found therein two library cards, a fishing license, a campfire permit, a Social Security card, a driver's license, a gas and electric bill, a water bill, and an invoice. These diverse documents possessed one trait in common: the name "Shirley Kremen" or any variations thereof were completely absent therefrom. On the contrary, the name favored by Mrs. Kremen at that time was "Kaplan".

The most brilliant flights of Mrs. Kremen's imagination, however, were reserved for Morrow, the unsuspecting Twain Harte real estate broker.

Her name, she said to Morrow, was "Mrs. Lee Kaplan". She wanted a cabin in a quiet spot for "a brother sick with nerves." Her brother was a musician. She liked the Germany place because "there was a stream there and it was very quiet".

Mrs. Kremen was not quite so successful in dealing with another Twain Harte business person. This happened to be a member of her own sex—Mrs. Dorothy Henrichsen, who, with her husband, owned a sports shop. In company with Steinberg and another man, identified as Thompson, Mrs. Kremen went to the sports shop to buy a pair of swim trunks "for a friend who was ill at the time". Mrs. Henrichsen tried to dissuade the trio from buying swim trunks for an ab-

sentee wearer-to-be, "because there is no return or refund on swimming clothes". Mrs. Henrichsen's sensible advice was not taken, and when Mrs. Kremen later tried to exchange the trunks, she was unsuccessful. Thereafter she dealt solely with *Mr.* Henrichsen.

The foregoing excerpts, isolated from their respective contexts, of necessity give only an incomplete picture of the subterfuges, deceptions, half-truths, and downright lies resorted to by the quartet in their effort to shield Thompson and Steinberg from capture.

Only a careful and critical perusal of the 941 pages of the transcript can give anything like an adequate picture of the situation.

Such perusal we have endeavored to make, and we find that the record supports the verdicts of the jury and the judgments of the court based thereon.

It will not do to give lip service to "that great Anglo-American institution, the trial jury", and then set aside a verdict whenever it happens to embody a conclusion with which some appellate judge happens to disagree.

10. *The Inartificial Recital of the Charge on Which Thompson Was Convicted Does Not Vitiate Counts 1 and 2.*

The appellants complain that "The first and second counts of the indictment do not state any offense against the United States since they do not charge Thompson with a violation of the Smith Act." We have already referred to the looseness in pleading Thompson's conviction, and have fully set forth the precise charge on which he was convicted. We have also given the substance of the present indictment.

Counts 1 and 2 of the indictment specifically refer to Thompson's violation of "Sections 2, 3 and 5 of the Act of June 28, 1940, commonly known as the Smith Act".

The appellants were fully apprised of the crime of which Thompson was convicted. Not only was the trial fully cov-

ered by the press and officially reported in the Federal Reporter, Second Series, as already stated, but the very sections of the Smith Act under which Thompson was prosecuted are enumerated in Counts 1 and 2 themselves. Entirely illusory is the appellant's expressed fear that "The omission of the statutory language * * * lays appellants open as a practical and legal possibility to another prosecution for the same offense".

Count One recites that on October 14, 1949, Thompson was convicted in New York for violations of three named sections of the Smith Act. It alleges that the appellants, knowing of his conviction, assisted Thompson in order to hinder his "apprehension and punishment".

Count Two again refers to Thompson's violation of the three sections of the Smith Act, and avers that the appellants conspired with each other and divers other persons to assist Thompson so as to prevent his apprehension and punishment.

These two counts are sufficiently specific to enable the appellants to prepare their defense and to protect them after their conviction from substantial danger of a new prosecution for the same offense. Their attack upon these counts is entirely without merit.

11. *The District Court's Instructions Were Adequate.*

(a) The appellants grudgingly concede that the lower court's instruction on reasonable doubt was proper when they say:

"Although the trial court paid lip service to the rule that in order to justify a conviction the circumstances had to be not only consistent with guilt but inconsistent with innocence * * *"

Translated into non-polemical language, this means that the instruction on reasonable doubt was correct. In any event, we so hold.

The appellants do object, however, to the District Judge's comment on the rule, as follows:

"Now, that rule has been given by judges for a long time. I myself have considerable doubt about it, although I tell you that it is the law, because I think it is just a hifaluting way of saying what I have already said to you, namely, that you can't find a verdict of guilty unless you are convinced of guilt beyond a reasonable doubt; and of course if you can draw two reasonable hypotheses from the same circumstances, of course there must be a reasonable doubt. But nevertheless I give you this rule because for a long time it seems to have been in the books."

The insistence of the appellants seems to be upon the "hypothesis of guilt" versus the "hypothesis of innocence" rule; for they say that "it is quite possible to have no reasonable doubt about a hypothesis of guilt while the evidence yet may also justify a hypothesis of innocence".

Yet it is precisely this "hypothesis of guilt" versus "hypothesis of innocence" rule that the Supreme Court has roundly criticized in . no uncertain terms. In Holland v. United States, 1954, 348 U.S. 121, 139–140, 75 S.Ct. 127, 137, 99 L.Ed. 150, the Court said:

"The petitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt. There is some support for this type of instruction in the lower court decisions [cases cited], but the better rule is that where the jury is properly instructed [as here] on the standards for reasonable doubt, *such an additional instruction on circumstantial evidence is confusing and incorrect,* [authorities cited]." Emphasis supplied.)

The appellants also complain that "the court expressly told the jury that there was no difference between a case in which the evidence was direct and one in which it was only circumstantial, since in both cases all that was required was the absence of a reasonable doubt. But that is not the law, * * * *"

In the Holland case, however, supra, 348 U.S. at page 140, 75 S.Ct. at page 137, the Supreme Court succinctly declared that the statement to which the appellants object *is* the law:

"Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. *If the jury is convinced beyond a reasonable doubt, we can require no more.*" (Emphasis supplied.)

(b) The appellants also assert error in the trial court's instruction that, "as a matter of law the record shows that Thompson was convicted of the said crime (described in the first count of the indictment)". We have already fully discussed the matter in connection with the sufficiency of the evidence. The instruction complained of discloses no reversible error.

12. *The Appellants Are Not in a Position to Complain of the Court's Failure to Give Certain Instructions; the Charge Given by the District Judge Was Adequate.*

The appellants assert that certain "full and complete instructions on the meaning and significance of the words used in the accessory and harboring statutes" were not given by the District Judge.

After the Court had delivered its charge to the jury, counsel for the appellants made the following statement relating to the above alleged omissions:

"Mr. Gladstein: The only other thing, your Honor, please, I don't have them listed, but we submitted, your Honor knows, a number of instructions dealing with such matters as harboring, concealing, accessory after the fact, matters of that kind, which I suppose your Honor feels that portion thereof with which your Honor agrees or which your Honor approves has been synthesized in your own instructions.

"But I do feel we requested matters of law to be given to the jury which are not comprehended within your Honor's instructions, and they are specifically set forth in our instructions. *I don't bear them in mind at the moment.* But I do want to take exceptions to your Honor's failure to give those instructions to the jury, particularly on the subject of what the purpose of harboring and concealing must be.

"In other words, by way of illustration, that not every form of assistance to a person who is a fugitive constitutes a violation of the law, and matters of that kind, which were embraced within the instructions which were submitted." (Emphasis supplied.)

Rule 18(2) (d) of this Court provides in part as follows:

"* * * When the error alleged is to the charge of the court, the specification shall set out the part referred to totidem verbis, whether it be in instructions given or in instructions refused, together with the grounds of the objections urged at the trial."

Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., reads in part:

"No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

A glance at the casual, vague, and generalizing remarks of counsel quoted above plainly reveals that neither Rule 30 of the Rules of Criminal Procedure nor our Rule 18(2) (d) was observed by him. Indeed, after the appellee's brief called attention to Rule 30, the subject of omitted instructions was not thereafter mentioned in the appellants' reply brief.

In recent years, this Court has repeatedly announced its intention to enforce the above two rules, and has so fully spelled out its reasons for doing so that they will not be repeated here.[4]

Nevertheless, we have carefully examined the instructions of the learned and experienced District Judge and find that, contrary to the appellants' contentions, he *did* deliver "full and complete instructions on the meaning and significance of the words used in the accessory and harboring statutes".

There is no merit to this sixth and final point urged by the appellants in their brief.

13. *Conclusion.*

Sections 2 and 101 of the Internal Security Act of 1950, 50 U.S.C.A. §§ 781 and 811, contain vitriolic philippics against Communism.[5] These sections are not pious generalizations such as might be found in a preamble or in a joint resolution. *They are formal statutory enactments by Congress;* enactments coequal in authority with any other Federal legislation; enactments that all American judges, State or Federal,

---

4. See Mitchell v. United States, 9 Cir., 1954, 213 F.2d 951, 957, certiorari denied, 1955, 348 U.S. 912, 75 S.Ct. 290, 99 L.Ed. 715.

5. It should be pointed out, however, that Section 4(f) of the same Act specifies that "Neither the holding of office nor membership in any Communist organization by any person shall constitute per se a violation of subsection (a) or subsection (c) of this section or of any other criminal statute." 50 U.S.C.A. § 784(f).

are sworn to uphold until such Congressional pronouncements are declared unconstitutional by the Supreme Court.

These statutory "indictments" of Communism are too lengthy to quote in full. We content ourselves with reproducing the first and ninth "counts":

"§ 781. *Congressional finding of necessity*

"As a result of evidence adduced before various committees of the Senate and House of Representatives, the Congress finds that—

"(1) There exists a world Communist movement which, in its origins, its development, and its present practice, is a world-wide revolutionary movement whose purpose it is, by *treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization.*

\*　　\*　　\*　　\*　　\*

"(9) In the United States those individuals who knowingly and willfully participate in the world Communist movement, when they so participate, in effect repudiate their allegiance to the United States, and in effect transfer their allegiance to the foreign country in which is vested the direction and control of the world Communist movement." (Emphasis supplied.)

This Congressional pronouncement accords with our own views and deep feelings on the subject. We do not propose to chase Constitutional phantoms that will lead us to assist a group of subversives in escaping condign punishment. We must avoid *leaning* too far backward in being "fair" to Communists, lest we *fall* backward into an abyss of error and give these enemies of the United States "aid and comfort"!

The Constitution does not require the judges who apply it to dwell in an ivory tower, or to reason in a vacuum, or to throw common sense out of the window.

The evidence in the instant case makes it clear that all the appellants knew that Thompson had been convicted under the Smith Act, and that he was a fugitive. They also knew of Steinberg's indictment.

We believe that there was ample lawful evidence to support the judgments of guilty against the appellants Kremen, alias "Kaplan"; Steinberg, alias "Stein" alias "Newberg"; Coleman, alias "Gordon"; and Ross, alias "Newman".

The judgments are affirmed.

HEALY, Circuit Judge.

I agree with the result reached in the affirming opinion.

■ The evidence of the guilt of the appellants on the counts of which they were convicted was necessarily circumstantial. The situation involved was very much out of the ordinary—so much so that there is little or no precedent for it. The accused persons were obviously individuals of intelligence, and it would strain credulity to the breaking point to infer from the circumstances anything other than that they knew perfectly well who each of their associates was and for what purpose all had gathered together in this remote cabin in the depths of the mountains. The jury were properly and fully instructed as to the law and the burden of proof resting on the government, and I see no ground upon which we would be justified in disturbing their verdict.

■ As to the search and seizure by the officers, I think it was warranted by law in the circumstances shown.

DENMAN, Chief Judge (dissenting).

The court's opinion violates the long established and essentially required practice of considering separately the different appeals of the four appellants, presenting in all eighteen contentions of error. The opinion's pages of high rhetoric of the obvious, denouncing those who would seek to overthrow the government

by force, creates no excuse for such a violation. Rather it enforces our obligation to proceed in the non-Bolshevik method of such separate consideration of each of the several contentions of each defendant presented here. It is pertinent that the trial judge found no such condign wickedness in the demeanor of the defendants before him or in the reports of the probation officer. Of the 18 U.S.C. § 3 cases he imposed less than the maximum sentences and by making some of the sentences concurrent, none received the maximum sentence.

## I. The Convictions of Kremen, Ross and Coleman of Violating 18 U.S.C. § 1071.

### A. What Must Be Proved.

To convict one of violating Section 1071 the Government must prove that he harbored or concealed, so as to prevent discovery or arrest, any person for whose arrest a warrant had been issued under any law of the United States. Moreover the defendant must be shown to have harbored or concealed for the purpose of preventing discovery or arrest "after notice or knowledge of the fact that a warrant or process had been issued for the apprehension of such person".

Thus the Government must prove four things: the issuance of a federal warrant, the act or acts of harboring or concealing, a purpose to prevent discovery or arrest, and the knowledge of the defendant of the existence of the federal warrant. Mere occupancy of a house with a fugitive is not sufficient, and "General malevolence is not enough if the specific knowledge required by the statute is lacking." Fulbright v. United States, 8 Cir., 1937, 91 F.2d 210, 212.

There is no question that a federal warrant had been issued for the arrest of Steinberg on June 20, 1951 after his indictment on a charge of violating the Smith Act. 18 U.S.C. § 2385. The issue here is whether, as to each defendant considered individually, the Government proved acts of harboring or concealing Steinberg in order to prevent his discov-

ery or arrest and the knowledge of each that a federal warrant had been issued for his arrest.

B. What Was Proved As To Each Defendant Accused of Violating 18 U.S. C. § 1071.

*(i) Shirley Kremen.* There was ample evidence introduced to show that this defendant harbored or concealed Steinberg in order to prevent his discovery or arrest. She procured the secluded cabin "for her sick brother," did the shopping and housework, and helped establish a false identity for herself and Steinberg. These are acts of harboring and concealing done at least to prevent Steinberg's discovery.

However, the Government failed to prove that she did these acts to prevent discovery with knowledge that a federal warrant had been issued for Steinberg's arrest. The evidence showed only that she knew she was hiding him. It did not go further. There was no showing that she knew Steinberg's actual identity, his position in the Communist Party or even that he was a member of that Party. There is no evidence in the record that indicates that Mrs. Kremen was a Communist or even sympathetic to the aims and purposes of that Party.

There are many reasons why Mrs. Kremen might have hidden Steinberg. Among others, she might have known of the existence of the federal warrant. But equally as possible she might have thought that state police were seeking the man she knew as "Newberg", and she might have had a reason to protect him. She might have been a Communist or sympathetic to the Communist Party and told that Steinberg was to go "underground" in order to assume a new identity so that he could act in the future without being identified as a Communist.

The Government had the burden of negativing these alternative inferences. It, but not the majority opinion, recognizes this. The Government argues that an analogy to a stolen property situation should be applicable. One found with

such property has the burden of explaining how he received it. The Government asks this court to place a similar burden on one found in the presence of a fugitive when such a person has done acts of concealing to prevent discovery. However, unlike personal property Steinberg could transport himself from place to place and could give Mrs. Kremen any number of reasons why she should hide him. There is no reason to infer that he told her of the warrant rather than some other reason. The Government's position would place upon defendants in this type of case the burden of proving their innocence.

Mrs. Kremen's conviction on this count should be reversed.

(ii) *Samuel Coleman.* The evidence indicates that Coleman arrived at the Twain Harte cabin only a week before the arrest on August 27, 1953 although Kremen, Steinberg and perhaps Ross had been there since June or July of that year. The evidence produced by the Government showed only that Coleman had lived at the cabin and knew who Steinberg was. There was no evidence of any acts of harboring or concealing. He was not shown to have even helped with the housework or shopping. His mere presence in Twain Harte for a week does not constitute harboring or concealing Steinberg to prevent his discovery or arrest. It is more likely that Steinberg was concealing Coleman as far as the evidence in the record is concerned. There is no evidence at all that Coleman knew that a warrant for Steinberg's arrest had been issued.

Coleman's conviction on this count should be reversed.

(iii) *Carl Ross.* To show Ross' acts of harboring or concealing Steinberg the United States introduced two documents found on his person at the time of his arrest. One was the "contact" letter mentioned in the majority opinion which indicated that Ross was to secretly meet someone. The other was a grocery list calling for large quantities of food. The jury could have inferred that Ross was relaying messages to and from the people at the cabin and was providing Steinberg with food. These are acts of harboring or concealing to prevent discovery or arrest.

The evidence to show why Ross did these acts is as follows: Ross knew that Steinberg was a Communist Party member, that he had altered his appearance, and that he was living at a remote cabin. Ross was relaying messages to and from the cabin. Ross was a member of the Communist Party himself. The Government apparently urges that the jury could draw the following inferences. Communist Party members were interested in Smith Act indictments, especially of members who were leaders and whom they knew personally. Such indictments were publicized in the Communist Party press as well as in newspapers of general circulation. It was likely that Ross, being a Communist, would have read of the indictment of Steinberg, and that Ross would have realized that a warrent for arrest often follows an indictment. When he discovered Steinberg using an assumed name, having an altered appearance, and living in a remote cabin, he would have inferred that Steinberg was hiring from such a warrant.

However, there is no showing that Steinberg's indictment or warrant for arrest was ever publicized in the Communist Party press, or that, if they were so publicized, that Ross had read about it. Ross, like Mrs. Kremen, could have hidden Steinberg for any number of reasons.

The court in the Fulbright case, supra, concerning a prosecution under Section 1071, made the following observations which are relevant here:

"Knowledge that the fugitives were evading officers in general or that a state government had issued warrants for their arrest is immaterial. Such acts are beyond the purview of the statute. * * *

"Every circumstance pointed out is consistent with knowledge that

Langan and Sparger [the criminals harbored in the Fulbright case] were criminals, but it is equally consistent with appellant's ignorance of outstanding [federal] warrants for their arrest."

Fulbright v. United States, 8 Cir., 1937, 91 F.2d 210, 213, 214.

II. Conspiracy of Kremen, Ross and Coleman to Violate 18 U.S.C. § 1071.

Since the Government has failed to prove a case of harboring, as that crime is defined in Section 1071, against any of these three defendants it follows that the count charging a conspiracy to harbor Steinberg must fall as well for the same reasons.

III. The Convictions of Kremen, Ross, Coleman and Steinberg of Violating 18 U.S.C. § 3.

A. What Must Be Proved.

All of the appellants were convicted of being accessories after the fact to Robert Thompson's Smith Act conviction. Section 3 of Title 18 provides:

"Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact."

Therefore to convict appellants the Government must prove that (1) they knew Thompson had committed an offense against the United States, (2) they received, relieved, comforted or assisted Thompson, and (3) they did so in order to hinder or prevent his punishment. Again the evidence as to each appellant must be considered separately.

B. What Was Proved As to Each Defendant Accused of Violating 18 U.S.C. § 3.

(i) *Shirley Kremen.* Mrs. Kremen received, relieved, comforted and assisted Thompson by providing food and housing for him. However, there is no evidence to support an inference that she did so to prevent his punishment or that she had knowledge that Thompson had committed an offense against the United States. Thompson arrived at the cabin only a week before the arrest although Mrs. Kremen had been there some three months. There is no evidence she knew who Thompson was, that he was a Communist or that he was hiding from anyone. The evidence is just as consistent with the inference that she was hiding Steinberg and regarded Thompson as a trusted friend of Steinberg's who had come to visit or discuss business as it is with the inference of her knowledge as to who Thompson really was. No evidence was admitted which would show that she had any reason to follow in the newspapers the first Smith Act trial where Thompson was convicted, the appeal or Thompson's "bail jumping".

The conviction as to this count should be reversed.

(ii) *Carl Ross.* Ross' grocery shopping activities and contacts with others to bring information to the cabin constituted acts of receiving, relieving, comforting and assisting Thompson. The question is whether he knew that Thompson had committed an offense against the United States and whether Ross' assistance was designed to prevent Thompson's punishment. Ross knew Thompson as a Communist leader before Thompson's Smith Act conviction. Ross disappeared from his Minneapolis, Minnesota home shortly after that conviction and established a false identity for himself. He aided Thompson after seeing him with dyed red hair, noticing a large weight increase and learning that Thompson was using the name of Brennan. The jury could reasonably infer that Ross was aware of Thompson's Smith Act conviction and acted to prevent his punishment.

There was sufficient evidence to support the judgment as to this count.

(iii) *Samuel Coleman.* Coleman procured a car for Thompson and traveled with him to isolated resorts in Missouri and Montana. He helped establish a

false identity for Thompson as "Brennan." These are acts of receiving, relieving, comforting or assisting Thompson. The jury could reasonably infer that Coleman knew that Thompson had been convicted of violating the Smith Act and assisted him in order to prevent his punishment. Coleman was an officer of the Communist Party and well acquainted with Thompson. He disappeared from his New York home, leaving his wife and children, shortly after Thompson's conviction. He knew Thompson was dyeing his hair red and using a false name. Coleman established a false identity of his own. The jury could infer that such an official would know of the Smith Act conviction of one of the top leaders of the Communist Party.

There was sufficient evidence to support the conviction as to this count.

(iv) *Sidney Steinberg*. Steinberg, who was apparently in charge of the group at the cabin, provided lodging for Thompson. This was an act of receiving, relieving, comforting or assisting him. The jury could reasonably infer that Steinberg knew that Thompson had been convicted of violating the Smith Act and had assisted him in order to prevent his punishment. Steinberg and Thompson were both high leaders of the New York Communist Party. Steinberg knew Thompson, having worked with him a number of years including the year Thompson's trial began.

There was sufficient evidence to support the conviction as to this count.

IV. Conspiracy of Kremen, Ross, Coleman and Steinberg to Violate 18 U. S.C. § 3.

Since the Government has failed to prove a case of assisting Thompson to prevent his punishment with knowledge that he had committed a crime against the United States as to appellant Krem-

en, it follows that the count charging her with a conspiracy to so assist Thompson must fall as well for the same reasons. The counts charging Coleman, Ross and Steinberg with a conspiracy to so assist Thompson should be affirmed.

V. Search and Seizure.

Is the taking to San Francisco of all of the personal property of the four appellants from the four-room house and the two nearby automobiles, and the failure to make any search thereof until in San Francisco some two hundred miles from the house, a violation of the Fourth Amendment provision that appellants shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures"?

Certainly the seizure and transportation to San Francisco, the home of none of the appellants, of all their personal property other than that found to constitute evidence was beyond the authority of the federal officers. No question was asked of appellants whether they desired a caretaker to watch the house to see that such other property as the television set, etc., was not stolen. While this wrong done is not cognizable in this case it makes clear that the intent was to search their "papers, and effects" in San Francisco and not in the place of arrest which may have been authorized by Harris v. United States, 331 U.S. 145, 67 S. Ct. 1098, 91 L.Ed. 1399 and other cases.

In my opinion such a search of the "papers, and effects" in San Francisco violates the Fourth Amendment. The situation is analogous to that in United States v. Lefkowitz, 285 U.S. 452, 52 S. Ct. 420, 76 L.Ed. 877, recognized as still the law in United States v. Rabinowitz, 339 U.S. 56, at page 62, 70 S.Ct. 430, 94 L.Ed. 653.

Rehearing denied: DENMAN, Chief Judge, dissenting.