UNITED STATES v. RABINOWITZ.

No. 269, Docket 21360.

United States Court of Appeals
Second Circuit.

July 28, 1949.

Writ of Certiorari Denied Nov. 21, 1949.

See 70 S.Ct. 188.

CLARK, Circuit Judge, dissenting.

Irving C. Rosenkrantz, New York City, A. Lillienthal, New York City, Isidor Enselman, New York City, of counsel, for appellant.

John F. X. McGohey, U. S. Atty., New York City, Bruno Schachner, New York City, for appellee.

Before L. HAND, Chief Judge, and CLARK and FRANK, Circuit Judges.

L. HAND, Chief Judge.

The defendant appeals from a judgment of conviction upon two counts of an indictment: the first, for selling four altered postage stamps with intent that they should be "passed, published and used as true and genuine"; the second, for having in his possession 573 such stamps with intent to defraud. On the appeal he relies upon three alleged errors: first, that to sell or possess the stamps in question was not a crime, because the fraud proved could only have been upon stamp collectors and not upon the United States; second, that there was a fatal variance between the indictment and the evidence; third, that the stamps which were the subject of the second count were obtained by an unlawful search and seizure. The facts, as the jury might have found them from the evidence, were as follows. On February 6, 1943, the defendant, a seller of postage stamps to collectors, sold to an employee of the Post Office four cancelled stamps, across the face of which the defendant had caused to be printed what are known as "over-prints." An "over-print" consists of letters, which, at times and for purposes not here material, the Post Office finds it convenient to print upon the face of some of an issue of postage stamps; and "over-printed" stamps have a scarcity value to collectors. The defendant had taken stamps which had been issued without "over-prints" and had been used and cancelled; and he had employed an engraver by means of forging plates to print "over-prints" over the cancellation marks. Based upon the purchase, a Post Office inspector on February 16th procured from a United States Commissioner a warrant for the arrest of the defendant; and in company with several others, he went to the defendant's place of business, which consisted of a one room office, and arrested him. After making the arrest, the officials searched the office thoroughly for an hour and a half, opening filing cabinets, desk drawers and the like. Part of what they found they returned to the defendant; but they carried away 573 cancelled postage stamps with forged "over-prints," like the four stamps purchased on the 6th; and it was the possession of these that the second count alleged as a crime.

■ The first question is whether the phrase, "with the intent that the same be

passed, published, or used as true and genuine" in § 268 [now § 473], or the phrase, "with intent to defraud," in § 265 [now § 472], is limited to an intent directed against the United States, or whether it also includes an intent directed against others, among them stamp collectors. We agree that the phrase, "canceled stamps," in the definitory section—§ 261 [now § 8]—is not of itself conclusive upon that issue, for it is possible so to alter cancelled stamps ·as to defraud the United States.[1] Nevertheless we think that for other reasons the· section should be read in the broader sense. It has been twice decided that the specific intent which § 262 [now § 471] makes an element of the crime, is satisfied by an intent to defraud third persons,[2] and we can see no tenable distinction between § 262 and § 265 or § 268 in this regard. Moreover, as a new question, there is good reason to suppose that Congress wished to prevent citizens from being imposed upon by forged currency or forged stamps, even though the wrongdoer did not intend a fraud on the Treasury. In the first place, however limited the forger's purpose, it does not follow that the instrument might not later be used to the detriment of· the United States. That is obvious in the case of money, and the statute does not distinguish between the specific intent necessary in the case of money and that necessary in the case of stamps. Besides, quite aside from what may in addition have been a general desire to prevent people from being defrauded by these means, Congress may well have regarded it as important that the reputation of its issue should not be impaired by the infiltration of counterfeits.

■■ The second alleged error (that the pleading did not in detail forecast the evidence) reflects an attitude now long past. True, the allegations in an indictment must run enough in parallel with the evidence to identify the crime proved with that charged; but, that condition fulfilled, it is only necessary that the accused shall be well enough advised of the crime with which he is charged to prepare his defence; and that may be done by other means than the indictment. The first ten "forms," incorporated into Rule 58 of the Criminal Rules, 18 U.S.C.A., are examples of the general terms now permissible; moreover, Rule 52(a) includes "variance" among "harmless error," when it "does not affect substantial rights." That had been the law before the Rules were promulgated;[3] and the supposed variances here did not in the faintest degree "affect substantial rights" of the defendant. Nor would it make any difference in this respect though we thought that the sale of the four stamps on the 6th was not within § 268, but only within § 265.

■■ The last question is of the legality of the search and seizure of the 573 stamps, whose possession was the crime charged in the second count. The officers' entry and the arrest were concededly lawful; but was it a lawful incident of the arrest for the officers to search generally for any incriminating papers they might find in the defendant's office? If it were not for the decision of the Supreme Court in Trupiano v. United States[4] and if Harris v. United States[5] were its last utterance, we should have unhesitatingly held the seizure valid. Indeed, the circumstances were more aggravated in Harris v. United States; for the search at bar was limited to the single room of an office, instead of four rooms of an apartment. Moreover, the cases were alike as to the opportunity to procure a search warrant, for in Harris v. United States the officers had information that the two cheques which they wanted were in the accused's possession, just as the officers at bar had information that the defendant had other forged

---

[1] United States v. Pappas, 2 Cir., 134 F.2d 922. (C.A. 2).

[2] Foster v. United States, 10 Cir., 76 F.2d 183; Errington v. Hudspeth, 10 Cir., 110 F.2d 384, 127 A.L.R. 1467.

[3] Berger .v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; United States v. Cohen, 2 Cir., 145 F.2d 82;

United States v. Epstein, 2 Cir., 154 F.2d 806; Loper v. United States, 10 Cir., 160 F.2d 293.

[4] 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663.

[5] 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399.

"over-prints." Hence the legality of the search must turn upon how far Trupiano v. United States, supra,[4] has modified the earlier decision. As we read the opinion of the majority, it meant to hold generally that, whenever officers can safely get a search warrant, they must do so; and that it is only on occasions when the evidence is likely to escape, that they may couple a general search without warrant with a lawful arrest. That doctrine does not of course touch searches of the person when there has been a lawful arrest, with or without warrant; and we assume that a "search of the person" includes, not only the clothing which he is wearing, but the seizure of whatever is open and within his immediate reach. It is true that "immediate reach" involves a penumbra of uncertain area, but fixed outlines are impossible. We shall not try to reconcile Trupiano v. United States[4] with much that has gone before; and with great deference we feel justified in saying that complete reconciliation is impossible. Perhaps it is permissible to add that, so far as we can see, the doctrine which it lays down is inevitable unless the reasonableness of a search is to depend upon the presence of the party in the premises searched at the time of the arrest. As we suggested in United States v. Kirschenblatt,[6] that would make crucial a circumstance that has no rational relevance to the purposes of the privilege. The feelings which lie behind it have their basis in the resentment, inevitable in a free society, against the invasion of a man's privacy without some judicial sanction. It is true that when one has been arrested in his home or his office, his privacy has already been invaded; but that interest, though lost, is altogether separate from the interest in protecting his papers from indiscriminate rummage, even though both are customarily grouped together as parts of the "right of privacy." We might concede that arrest, involving as it does an entire loss of freedom, is the more oppressive; but that is not a reason for confusing with it the power to pry about at random. The history of the two privileges is altogether different; the Fourth Amendment distinguishes between them; and in statutes they have always been treated as depending upon separate conditions.

In the case at bar there was no excuse for not getting a search warrant. Already on February 1st the man, who had made the plates for the forged "over-prints," had been arrested and had confessed. He gave to the district attorney the defendant's name as that of one of his customers; and apparently it was on this information that the four stamps had been bought on the 6th. The arrest was not until the 16th; and no reason is suggested why during the following ten days it had not been possible upon this information to get a search warrant. Moreover, the defendant was doing a steady business openly and without apprehension, so that there was no reasonable chance that the stamps would disappear. Finally, Rule 41(c) did not require the forged stamps to be "identified" more specifically than as cancelled stamps bearing "over-prints";[7] and a warrant would have opened the premises to as free a search as the officers in fact made.

We hold that the search was unlawful and it follows that the conviction on both counts must be reversed, and that the second count must be dismissed. The first count will be remanded for proceedings in accordance with the foregoing.

Judgment reversed; cause remanded.

CLARK, Circuit Judge (dissenting).

As the opinion candidly concedes, reversal here requires us to do what the Supreme Court has so far carefully refrained from doing, namely, to overrule Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399. Since here the search was so much more restricted than that in the Harris case, we must in fact go further and repudiate what, as it seems to me, has been clearly permissible police

---

[4] 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663.

[6] 2 Cir., 16 F.2d 202, 203, 51 A.L.R. 416.

[7] Steele v. United States, No. 1, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757; United States v. Fitzmaurice, 2 Cir., 45 F.2d 133; Nuckols v. United States, 69 App.D.C. 120, 99 F.2d 353; Parts Manufacturing Corp. v. Lynch, 2 Cir., 129 F.2d 841, 143 A.L.R. 132.

736

activity in the past.[1] There is, indeed some irony in the fact that the long delay in the prosecution is what has given this guilty defendant his chance; at the time the search was made in 1943 or the first motion to suppress was denied in 1944, he would have been given short shrift judicially. But, even so, we have not been oversuccessful in attempting "to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant";[2] and I think it would be the part of wisdom to desist here, lest we "confound confusion in a field already replete with complexities."[3] This seems particularly so in view of the circumstance that proof of the crime charged in the first count was overwhelming and uncontradicted on the facts; yet reversal (for retrial) is also found necessary as to that.

In frankness I must add that, to me, a search within the limits here disclosed seems in the interest of justice, rather than otherwise. Since a warrant had been obtained for the arrest of the accused, it is thought that he has had all the benefit which an ex parte action by, usually, a minor federal official, a United States commissioner, can afford. The formality of signing an additional legal document, a warrant for search, will not add more of deliberation or concern for individual rights to the police activity. It is not a full answer to say that the officers must, a fortiori, have had time to procure such a warrant, for that overlooks the practical problems of foreseeability of all eventualities which they then have to face. Involved is not only the question of "identifying the property," and of "particularly describing" it in advance, F.R.Cr.P. 41(c); and compare the former 18 U.S.C.A. §§ 613, 616—I hope this becomes as simple a matter as my brothers indicate, although I have some misgivings—but the whole problem of whether the officers are to be confined to looking for what they already know about or whether, instead, they may not remove what is before them in the culprit's place of business and use it to show the extent and ramifications of a criminal course of conduct they had already uncovered. This decision must mean quite simply that no search without a warrant of even a business office can ever be made unless the arrest can also be made without a warrant. Since the pressure of public opinion compels police officers to secure convictions, at least of the obviously guilty, the practical answer will be to arrange for such arrests and such searches only, resulting in rather less than more protection of the individual in the long run. Moreover, while search of a man's home is a serious infringement of personal liberties, I do not believe a like view should be taken of a man's place of business where acts of crime have already been found to have been committed by him.

---

[1] See our analysis of past precedents in Matthews v. Correa, 2 Cir., 135 F.2d 534, and United States v. Lindenfeld, 2 Cir., 142 F.2d 829, certiorari denied 323 U.S. 761, 65 S.Ct. 89, 89 L.Ed. 609, relied on in the Harris case, 331 U.S. at pages 151, 152, 154, 67 S.Ct. at pages 1101, 1102, 1103, 91 L.Ed. 1399; and note the recent reinstatement of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L. Ed. 543, 39 A.L.R. 790, in Brinegar v. United States, 69 S.Ct. 1302; and see 18 U.S.C.A. § 2236, formerly § 53a.

[2] L. Hand, J., dissenting in Spector Motor Service v. Walsh, 2 Cir., 139 F.2d 809, 823, judgment vacated in Spector Motor Service v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101.

[3] Vinson, C. J., dissenting in Trupiano v. United States, 334 U.S. 699, 716, 69 S.Ct. 1229, 92 L.Ed. 1663.