Arthur FRESNEDA, Appellant,

v.

STATE of Alaska, Appellee.

No. 1045.

Supreme Court of Alaska.

Aug. 27, 1969.

W. G. Ruddy, Juneau, for appellant.

Harold Tobey, Dist. Atty., Juneau, for appellee.

OPINION

Before NESBETT, C. J., and DIMOND, RABINOWITZ, BONEY and CONNOR, JJ.

BONEY, Justice.

Appellant was arraigned by the superior court at Juneau, Alaska, on a three-count indictment charging him with possession of marijuana on December 3, 1967, sale of marijuana to a minor on December 3, 1967, and possession of marijuana on December 10, 1967 (the day of appellant's arrest), all in violation of AS 17.10.010,[1] which makes it a crime to possess or sell in an unauthorized manner any narcotic drug. At the time of indictment, AS 17.10.230(13)[2] included marijuana in the definition of "narcotic drug".

On April 12, 1968, the superior court heard argument on appellant's motion to dismiss which was based on appellant's claim that the statute in question, AS 17.10.200,[3] which prescribed the penalties for violations of the laws concerning narcotic drugs, would inflict cruel and unusual punishment on appellant.

In determining the motion it was assumed that appellant had two prior narcotic convictions and that the mandatory minimum sentence he could receive would be 20 years imprisonment for each count of possession and life imprisonment for sale to a minor.[4] The statute also forbids suspension, probation and parole until the minimum sentence is served.[5] Thus appellant believed he was faced with mandatory life imprisonment without possibility of parole or suspension. Appellant argued that since it was the mandatory minimum sentence he was attacking, he did not have to wait until sentence was actually imposed. He contended that he was being prosecuted under a law which could only result in a cruel and unusual punishment.

At a later hearing, June 3, 1968, the court denied the motion to dismiss, finding that appellant lacked standing to attack the statute. The court reasoned that the only way appellant could attack the statute be-

1. AS 17.10.010 states as follows:
   It is unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, give, barter, supply or distribute in any manner, or compound any narcotic drug except as authorized in this chapter.

2. AS 17.10.230(13) in pertinent part states as follows:
   "[N]arcotic drugs" means coca leaves, opium, cannabis [marijuana], isonipecaine, amidone, isoamidone, ketobemidone, and every other substance neither chemically nor physically distinguishable from them * * *.

3. AS 17.10.200 in pertinent parts states as follows:
   (a) A person who violates any provision of this chapter except a provision relating to the keeping of records, upon conviction, is punishable by a fine of not more than $5,000 and by imprisonment for not less than two nor more than 10 years. For a second offense, or for a first offense where the offender has previously been convicted of a violation of the laws of the United States or of any other state, territory or district relating to narcotic drugs, the offender is punishable by a fine of not more than $7,500 and by imprisonment for not less than 10 nor more than 20 years. For a third or subsequent offense, or if the of-

fender has previously been convicted two or more times of a violation of the laws of the United States or of any other state, territory or district relating to narcotic drugs, the offender is punishable by a fine of not more than $10,000 and by imprisonment for not less than 20 nor more than 40 years.
   *       *       *       *       *
   (c) A person convicted of illegally selling, giving or supplying narcotic drugs to a person under the age of 21 years is punishable
   *       *       *       *       *
   (3) if the offense is a third violation or if the offense is a first or second violation and the offender has previously been convicted two or more times of any violation of this chapter or of the laws of the United States, or of any other state, territory or district relating to narcotic drugs, by imprisonment for the remainder of his natural life.
   (d) The imposition or execution of sentence shall not be suspended and probation or parole shall not be granted until the minimum imprisonment provided in this section for the offense is served.

4. AS 17.10.200(a), *supra* n. 3 at 2–3; AS 17.10.200(c)(3), *supra* n. 3 at 3.

5. AS 17.10.200(d), *supra* n. 3 at 3.

fore trial was if the mandatory minimum sentence were unconstitutional. The court further noted that the provision of AS 17.-10.200 concerning minimum sentences is in conflict with a later statute, AS 12.55.085 (a) [6] which purports to allow the court to suspend a portion of any sentence and to place the person on probation. The court stated that as a matter of practice it relied on the later statute as authority for disregarding mandatory minimum sentences imposed by statutes enacted prior to AS 12.55.085(a). The court reasoned that if appellant was not faced with a minimum sentence, then there was no way in which appellant could attack the statute as imposing a cruel and unusual punishment. Appellant could wait until conviction and sentence and then attack his actual sentence as cruel and unusual punishment.

Appellant filed a second motion on May 20, 1968, attacking the constitutionality of the laws relating to marijuana for reasons apart from the issue of cruel and unusual punishment. Appellant contended that the statute improperly classified marijuana with hard narcotics, exceeded the police power of the state, was violative of due process, and denied appellant equal protection of the laws. Appellant also moved for an order directing the state to pay for the transportation and fees of an expert witness to testify in support of the second motion to dismiss. This motion was denied because the court could find no authority that required it to provide such funds, and the court did not have sufficient funds allocated to it for this purpose. Additionally, the court stated that a single witness would not really be sufficient to provide the factual background for a "test case" on the constitutionality of the laws concerning marijuana. The second motion to dismiss was taken under advisement and denied at trial after the defense rested.

A jury returned a verdict on June 20, 1968, finding appellant guilty of two counts of possession of marijuana and one count of illegal sale of marijuana to a minor. The court noted that after the trial but before sentencing and final judgment a new law had taken effect which defined marijuana not as a narcotic but as a dangerous drug, AS 17.12.150(3) (A) [7] According to AS 17.12.110 [8] possession of marijuana became

---

6. AS 12.55.085(a) states as follows:

If it appears that there are circumstances in mitigation of the punishment, or that the ends of justice will be served, the court may, in its discretion, suspend the imposition of sentence and may direct that the suspension continue for a period of time, not exceeding the maximum term of sentence which may be imposed, and upon the terms and conditions which the court determines, and shall place the person on probation, under the charge and supervision of the probation officer of the court during the suspension.

7. AS 17.12.150(3) (A) states as follows:

"[D]epressant, hallucinogenic or stimulant drug" means:

(A) cannabis [marijuana], psilocybin, dimethyltryptamine, lysergic acid diethylamide, and every other substance having similar physiological effects * * *.

8. AS 17.12.110 states as follows:

(a) A person who violates a provision of this chapter relating to the possession or control of depressant, hallu-cinogenic and stimulant drugs, when his possession or control is for his own use, is guilty of a misdemeanor and upon conviction is punishable by imprisonment for not more than one year, or by a fine of not more than $1,000, or by both.

(b) A person who violates a provision of this chapter other than one mentioned in (a) of this section, or a person who violates a provision of this chapter relating to the possession or control of depressant, hallucinogenic and stimulant drugs, when his possession or control is for the purpose of sale or other disposal to another person, is guilty of a felony and upon conviction is punishable as follows:

(1) for the first offense, by imprisonment for not more than 25 years, or by a fine of not more than $20,000, or by both;

(2) for the second and subsequent offenses, by imprisonment for any term of years or life, or by a fine of not more than $25,000, or by both.

(c) A person who violates a provision of this chapter by selling or otherwise

a misdemeanor and although sale was still a felony, there were no minimum sentences required. These statutes and the corresponding amendment of AS 17.10.230(13) [9] (delating marijuana as a narcotic) became effective August 4, 1968. Appellant was sentenced on August 12, 1968, and judgment was entered formally on August 14, 1968. The court after considering the memoranda of counsel, sentenced appellant according to the newly enacted statutes, to a total of 8 years with 3 years suspended.

Reviewing the events preceding appellant's arrest, it appears that in November of 1967, Sherri Dawn Meachem, age 16, went to Sergeant Cunningham of the Juneau police department and offered to help stop the traffic in marijuana in the Juneau area. She told Sergeant Cunningham that Jim Hastings, the roommate of appellant, had in the past sold marijuana to her husband; she did not mention the name of appellant at this time. Sergeant Cunningham did not direct Sherri Meachem to approach Hastings for the purpose of buying marijuana, but he did offer to cooperate with Sherri Meachem and told her that he would supply the money to make a purchase if she needed it.

A few days later Sherri Meachem approached Jim Hastings and requested that he sell her some marijuana. He stated that he did not have any of it at that time but would be getting some in the near future. According to Hastings' testimony he actually did have marijuana at that time, but wished to be cautious and investigate Sherri Meachem before making a sale.

On December 3, 1967, Jim Hastings and appellant went to the apartment of Sherri Meachem, evidently to make a sale to her; however, because she did not have any money they agreed to meet later at a bowling alley. It was appellant's testimony

that he was not a party to any of the transactions between Hastings and Sherri Meachem. According to the testimony of Meachem and Hastings, appellant took part in the transaction of December 3 by wrapping the marijuana to be sold, and by suggesting that Sherri Meachem bring ten dollars to the bowling alley that night. Hastings testified that appellant had not made any sales other than his participation in the sale of December 3, 1967.

After appellant and Hastings left her apartment on December 3, 1967, Sherri Meachem obtained two five dollar bills from Sergeant Cunningham, who noted the serial numbers of the bills. That evening, December 3, appellant, Hastings and Sherri Meachem met at the bowling alley and according to Sherri Meachem and Hastings, appellant handed three marijuana cigarettes to Hastings, who in turn gave them to · Sherri Meachem. Sherri Meachem paid the ten dollars to Hastings. The money was immediately spent by appellant and Hastings. It is undisputed that the marijuana belonged to Hastings and not to appellant. Later, on the evening of December 3, Sherri Meachem turned the three marijuana cigarettes over to Sergeant Cunningham. No arrests were made at this time, because Chief Wellington of the Juneau police department wished to get at the source of supply of marijuana.

On December 10, 1967, Sherri Meachem again went to the police and informed them that another sale had been made to her by Hastings. There was no evidence linking appellant with the sale made on December 10, 1967. As a result of this sale the police decided to arrest appellant and Hastings.

On December 10, 1967, Chief Wellington, Lieutenant Ciraulo, Sergeant Cunningham, of the Juneau city police department, and an attorney from the Juneau district at-

disposing of a depressant, hallucinogenic or stimulant drug to a person less than 19 years of age is guilty of a felony and upon conviction is punishable by imprisonment for any term of years or life, or by a fine of not more than $25,000, or by both.

9. AS 17.10.230(13) states as follows:
"[N]arcotic drugs" means coca leaves, opium, isonipecaine, amidone, isoamidone, ketobemidone, and every other substance having similar physiological effects * * *.

torney's office proceeded without arrest or search warrants to the apartment where appellant and Jim Hastings lived. The officers knocked and entered the apartment. The apartment consisted of a bedroom, kitchen, bathroom and possibly another room. When the officers entered they found Hastings and appellant. Hastings had opened the door for the police after delaying a minute or two, enabling appellant to throw a quantity of marijuana into an oil stove. Appellant denied having done this.

The police officers proceeded to search the apartment thoroughly. Sergeant Cunningham testified that they were not looking for the two five dollar bills whose serial numbers had been noted. These bills were never recovered. Lieutenant Ciraulo stated that the search was a "matter of routine". Chief Wellington stated that they were looking for weapons which could be used to effect an escape and for any evidence which could be used "in a criminal case". There is no direct evidence that the police were looking for anything specifically related to the events of December 3, 1967.

During the search, Lieutenant Ciraulo opened a cabinet in the kitchen area. According to the police officer, appellant admitted at the time that he kept his things in the cabinet. The officer found in the cabinet some letters addressed to appellant and a toothbrush container. Upon opening the toothbrush container, the police officer discovered three marijuana cigarettes. Hastings testified that all the marijuana in the apartment belonged to him but that the three cigarettes in the toothbrush container were not his and had never been seen before by him. These three marijuana cigarettes were introduced at trial over the objection of appellant, and formed the basis of the charge of possession of marijuana on December 10, 1967. Appellant and Jim Hastings were arrested at their apartment.

Although it was never brought out exactly at what point the arrests were made, the arrests may have occurred before the search.

Appellant raises the point that the search conducted at the time of arrest in the apartment which he shared with Jim Hastings was unreasonable and illegal. Appellant claims that a warrant to search could have been issued in the week preceding the arrest, yet the police officers chose to proceed without one. If the search were found to be unreasonable, then the evidence resulting from the search, the three marijuana cigarettes, would be inadmissible under both the Constitution of the United States and the Alaska Constitution.[10]

The fourth amendment of the United States Constitution insures "[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The comparable provision of the Alaska Constitution article I, § 14 provides:

> The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It is generally agreed that the right to privacy is the foundation of the fourth amendment guarantees.[11]

Although the framers of the Constitution did not mention searches incidental to an arrest, the courts began some time ago to carve out an exception to the fourth amendment based on the necessity of an immediate search upon arrest. Although there is wide agreement that a warrantless search incidental to an arrest is not unreasonable, there has been much confusion con-

10. Goss v. State, 390 P.2d 220, 223 (Alaska 1964).

11. Warden v. Hayden, 387 U.S. 294, 301, 87 S.Ct. 1642, 18 L.Ed.2d 782, 788–789 (1967); Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746, 751 (1886).

cerning what kind of search is truly incidental in character.[12] Some courts have acknowledged that the decisions in this area are not altogether harmonious.[13]

In dealing with a matter which affects the very essence of constitutional liberty, history becomes of more than academic importance. Our political ancestors forged our constitution on the anvil of their experience and with a view toward what they regarded as certain governmental evils. The matters that concerned them can provide valuable insight into the intentions and the underlying principles embodied in the Bill of Rights. The use we want to make of this material will vary, of course, with one's outlook. Much depends in these cases "on whether one gives that Amendment a place second to none in the Bill of Rights, or considers it on the whole a kind of nuisance, a serious impediment in the war against crime."[14]

The historic struggle which gave birth to the fourth amendment is discussed thoroughly in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), and in the scholarly and detailed dissents of Mr. Justice Frankfurter in Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), and in United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).[15]

One of the major grievances which contributed to the American Revolution was the practice of the Crown, through its colonial officials, of issuing general warrants and writs of assistance. These were described by the colonist James Otis, in a celebrated debate in 1761, as "the worst instrument of arbitrary power, the most de-

structive of English liberty and the fundamental principles of law, that has ever been found in an English law book." He noted that such writs placed "the liberty of every man in the hands of every petty officer."[16] In the meantime, before the American Revolution the English courts themselves had started to restrain the power of the Crown to issue and execute such writs to the detriment of the fundamental rights of Englishmen.

Lord Camden, in Entick v. Carrington, 19 Howell, St.Tr., 1029, declared illegal and void a general warrant issued by the Secretary of State, finding that the pretended power of the Crown to issue such writs had no valid legal basis. This case was decided in 1765, and in the following year the House of Commons passed resolutions condemnatory of general warrants, whether for the seizure of persons or papers. Thus general warrants, which had their origin in the notorious Star Chamber of earlier times, had largely been declared invalid before the American Revolution. This may well be the reason that general warrants were not expressly prohibited by the fourth amendment. As Mr. Justice Bradley noted in Boyd v. United States, concerning the intention of the framers, it was probably so obvious to them that general warrants were invalid that they did not trouble to prohibit them expressly in the framing of the Bill of Rights. As he put it:

The struggles against arbitrary power in which they had been engaged for more than twenty years, would have been too deeply engraved in their memories to allow them to approve of such insidious

---

12. Although this court has applied the doctrine of incidental searches in Merrill v. State, 423 P.2d 686, 700 (Alaska 1967); Maze v. State, 425 P.2d 235, 238 (Alaska 1967); and Goss v. State, 390 P.2d 220, 223 (Alaska 1964); only in Ellison v. State, 383 P.2d 716, 719 (Alaska 1963) has there been occasion to discuss some of the limits of the doctrine.

13. Hernandez v. People, 153 Colo. 316, 385 P.2d 996, 1000 (1963); State v. Chinn, 231 Or. 259, 373 P.2d 392, 397 (1962).

14. Harris v. United States, 331 U.S. 145, 157, 67 S.Ct. 1098, 1104, 91 L.Ed. 1399, 1409 (1947) (Frankfurter, J., dissenting).

15. *See also* Lasson, The History and Development of the Fourth Amendment to the United States Constitution (1937).

16. Boyd v. United States, 116 U.S. 616, 625, 6 S.Ct. 524, 29 L.Ed. 746, 749 (1886).

disguises of the old grievance which they had so deeply abhorred.

Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, 751 (1886).

The earlier interpretations of the fourth amendment by the United States Supreme Court were restrictive as to the search which might be performed incidental to an arrest. To the courts of an earlier time the reason was quite obvious. If searches under a valid search warrant were limited in purpose and scope, and if such warrants, issued by a magistrate, were required in order to justify even a limited search, then it followed logically that a search incidental to an arrest must, if anything, be more limited. For this reason the earlier decisions speak about searching the person of the one placed under arrest, and of being able to seize those things which were immediately under his physical control, meaning things under his control in the sense that they were virtually extensions of his body.[17] Additionally, it was determined that contraband or fruits or instruments of the crime which were in plain view in the presence of the officer at the time of arrest might also be seized without a search warrant. General exploratory searches were universally condemned;[18] however, the location of the dividing line between exploratory searches and incidental searches was soon blurred beyond recognition.[19]

In Harris v. United States, 331 U.S. 145 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), an expansion of the permissible scope and purpose of a search incidental to an arrest took place at the hands of a divided court. The majority in Harris proceeded under the theory that because a man's apartment or dwelling house is under his constructive possession, all parts of it may be searched incident to a valid arrest, but without a search warrant. There were four dissenters to the decision. In Harris, police officers made a five hour search of defendant's living room, bedroom, bathroom and kitchen. The officers had obtained valid arrest warrants for check forgery, but had not obtained search warrants. The officers testified that they were specifically searching for two forged checks, and due to the physical dimensions of checks they were required to search through defendant's papers and drawers. During the search, forged draft documents were found and seized, and became the basis of the subsequent prosecution. The Supreme Court held that the entire apartment was under the "immediate control" of defendant, who had been arrested in the living room, and that the search was incidental and not a general exploratory one.

The importation of the property law notion of constructive possession and control was reaffirmed in United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). Mr. Justice Frankfurter, in his dissent, after first discussing the history of the fourth amendment, reviewed the doctrine of search incident to arrest and observed:

Its basic roots, however, lie in necessity. What is the necessity? Why is search of the arrested person permitted? For two reasons: first, in order to protect the arresting officer and to deprive the prisoner of potential means of escape, Closson v. Morrison, 47 N.H. 482, 93 Am.Dec. 459, and, secondly, to avoid destruction of evidence by the arrested per-

17. Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652, 655 (1914).

18. United States v. Lefkowitz, 285 U.S. 452, 465, 52 S.Ct. 420, 76 L.Ed. 877, 883 (1932) ; Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374, 382 (1931). For a vivid example of an over intensive, exploratory search made incidental to an arrest see Kremen v. United States, 231 F.2d 155 (9th Cir. 1956), rev'd per curiam 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957).

19. For an outline of the United States Supreme Court's decisions in this area, see Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

son. See Reifsnyder v. Lee, 44 Iowa 101, 103, 24 Am.Rep. 733; Holker v. Hennessey, 141 Mo. 527, 540, 42 S.W. 1090, 1093, 39 L.R.A. 165, 64 Am.St.Rep. 524. From this it follows that officers may search and seize not only the things physically on the person arrested, but those within his immediate physical control. What a farce it makes of the whole Fourth Amendment to say that because for many legal purposes everything in a man's house is under his control therefore his house—his rooms—may be searched. * * * Apart from such instances of loose use of language, the doctrine of search incidental to arrest has, until very recently, been strictly confined to the necessities of the situation, i. e., the search of the person and those immediate physical surroundings which may fairly be deemed to be an extension of his person.

Id. at *72–73*, 70 S.Ct., at *437–438*, 94 L.Ed. at *663–664*.

As Judge Hand noted, it is one thing to search a man's pockets and something else to ransack his entire house for everything which may incriminate him, having gained lawful entry in order to effect an arrest.[20] While general exploratory searches, even under a search warrant, are universally condemned, there is the danger that warrantless searches incident to arrest will be used to subvert the prohibitions of the fourth amendment. It is not adequate to make the cautionary statement that the police must not purposely arrest one in his home in order to perform a search incident to arrest. If the privilege of search at-

taches at all, it is the validity of the arrest which justifies it, not the motivations which may lie behind the timing of the arrest. To permit a general search incidental to an arrest in one's dwelling is to make crucial an element which is irrelevant to the right to privacy protected by the fourth amendment.

[I]t is small consolation to know that one's papers are safe only so long as one is not at home.

United States v. Kirschenblatt, 16 F.2d 202, 203, 51 A.L.R. 416 (2d Cir. 1926) (L. Hand, J.). The reasons for performing an arrest at a given time and place can be so numerous and interwined that it is not possible in most cases to demonstrate one way or the other that the officers sought, through arrest in one's home, to execute a general search which would be prohibited even under a valid search warrant.

After the *Harris* and *Rabinowitz*, decisions, for a warrantless search to be justified as incidental to a lawful arrest many tests had to be met. The search could not be too remote in time or place from the arrest.[21] The necessity and purpose of the search had to be justifiable independently from the arrest, and it was the purpose that set the limits for the permissible scope, intensity, and duration of the search.[22] A lawful arrest did not give the police the absolute "right" to search the arrested person and the place of arrest. However, it was and still is true that in most arrest situations there is a need to search the arrested person for weapons in order to insure the safety of the arresting officer. It was the need, not the arrest that justified

---

20. It is true that when one has been arrested in his home or his office, his privacy has already been invaded; but that interest, though lost, is altogether separate from the interest in protecting his papers * * *.

    United States v. Rabinowitz, 176 F.2d 732, 735 (2d Cir. 1949) (L. Hand, J.).

21. Merrill v. State, 423 P.2d 686, 700 (Alaska 1967).

22. Terry v. Ohio, 392 U.S. 1, 17–18, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889, 903–904 (1968):

    This Court has held in the past that a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope. [Cites omitted] The scope of the search must be "strictly tied to and justified by" the circumstances which rendered its initiation permissible.

the search. It was also clear that a search to be incidental and reasonable had to be one in which the officers were looking for specific articles, and it had to be conducted in a manner reasonably calculated to uncover such articles.

The difficulty of courts in creating a workable criterion from the notions of reasonableness based on a consideration of all the circumstances is illustrated by even a brief look at the factual situations in which courts have attempted to juggle such terms as "intensity", "specificity", "purpose", and "duration".[23]

In Hernandez v. People, 153 Colo. 316, 385 P.2d 996 (1963) defendant was arrested in his apartment for assault to murder, and the arresting officers searched the apartment and found keys to the defendant's automobile. The officers took the keys, went downstairs, searched the car, and found a stolen dictating machine. This was held an illegal search. There was no mention of what the officers could have been looking for.

In United States v. Marrese, 336 F.2d 501 (3d Cir. 1964) the arrest was on the first floor of a rooming house. The police went upstairs to defendant's room, searched it and found an illegal shotgun. The arrest had been for desertion. This was held a general exploratory search. However, in State v. Cook, 70 Wash.2d 715, 424 P.2d 1006 (1967) defendant was arrested downstairs in the kitchen of his house. Officers searched for two hours after defendant had been taken to police headquarters, and in defendant's brother's bedroom upstairs, hidden in a panel of the ceiling, the police found a .45 automatic evidently used in a holdup by defendant. The court found a valid search incidental to an arrest.

In State v. Dodd, 28 Wis. 643, 137 N.W. 2d 465 (1965), three narcotics officers went to Dodd's apartment to arrest him on a charge of assault and battery. Upon being admitted into the apartment by Dodd, they found him and his female companion in their night clothes. Upon ascertaining that the couple were unmarried and had been cohabiting, the officers arrested Dodd for lewd and lascivious conduct. The three narcotic officers, who made the arrest, then proceeded to search the apartment. The "incidental" search revealed two seeds of marijuana in the pocket of a shirt found in a small closet off the living room. This evidence was held inadmissible. However, the same court in Jackson v. State, 29 Wis. 225, 138 N.W.2d 260 (1965) held a search valid in the following circumstances: Officers entered the apartment of defendant at night to arrest her for parole violation and to arrest her boy friend for encouraging the violation. Once inside, the officers observed needle marks on defendant's arms; she admitted using heroin the day before at the apartment. The officers then arrested her for illegal use of heroin and searched the apartment finding heroin paraphernalia underneath papers on the floor of a closet. The court held the search valid.

While the lower courts have been endeavoring to cope with the application of the standard of reasonableness to incidental searches, the United States Supreme Court, in a series of recent decisions, has made clear that the fourth amendment protects people in their right to privacy, not simply places or things. The right is now measured by the reasonable expectations of privacy which are necessary to a civilized way of life. Property law distinctions have been abandoned as a determinant of the right to privacy.

23. Mr. Justice Jackson commented in his dissent to Harris v. United States, 331 U.S. 145, 197, 67 S.Ct. 1098, 1120, 91 L.Ed. 1399, 1431 (1947):

The difficulty with this problem for me is that once the search is allowed to go beyond the person arrested and the objects upon him or in his immediate physical control, I see no practical limit short of that set in the opinion of the Court—and that means to me no limit at all.

The Supreme Court has abandoned the necessity of finding a trespass, under property law principles, as a prerequisite to obtaining suppression of evidence gathered by violating the privacy of the one seeking its suppression.[24] The court has refused to import the subtle property law distinctions between lessee, licensee and invitee into the law of search and seizure.[25] The Court has abolished the distinction between seizure of items of "mere evidence" and seizure of instrumentalities, fruits of the crime, and contraband,[26] and the court has found no reason to distinguish between the suppression of tangible and intangible evidence which is the product of an illegal search and seizure.[27] Thus the court has recognized that property interests do not control the government's privilege of making reasonable searches and seizures; rather, it is the right to privacy which is controlling.

In line with these decisions, the Supreme Court has recently reviewed the subject of search and seizure, and has overruled the *Harris* and *Rabinowitz* cases. In Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, 694 (1969) the Supreme Court decided to return to its earlier precedents by adopting the rule that incidental searches may extend only to the person of the suspect in order to remove any weapons that the suspect may have in order to prevent the concealment or destruction of any evidence on the suspect's person. "And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule." Thus "immediate control" has resumed its original meaning. The Court reasoned that there is no justification for searching rooms other than that in which an arrest occurs, or for that matter, for searching through all the drawers or concealed areas in that room itself.

■ Turning to the case at hand, we find that in light of Chimel v. California, we must reverse and remand for a new trial.[28] The search conducted on December 10 at the time of arrest went beyond the limits set forth in *Chimel*. The officers searched the entire apartment which was occupied by appellant and his roommate. The only explanation for the search in the record is found in the testimony of Lieutenant Ciraulo, who stated the search was "routine" and Chief Wellington, who stated they were looking for weapons and evidence to be used in a criminal case. The results of the search were three marijuana cigarettes found in a toothbrush container which was inside a kitchen cab-

24. Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576, 583 (1967) ; Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734, 739 (1961).

25. Jones v. United States, 362 U.S. 257, 266, 80 S.Ct. 725, 4 L.Ed.2d 697, 705 (1960).

26. Warden v. Hayden, 387 U.S. 294, 300–301, 87 S.Ct. 1642, 18 L.Ed.2d 782, 788 (1967).

27. Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441, 454 (1963).

28. We are not deciding whether Chimel should be given only prospective effect according to the analysis of the relevant factors listed in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). We do decide that we will apply Chimel to cases pending on direct review in this court as of the date of the Chimel decision. Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248, 259–261 (1969) (J. Harlan, dissenting); Linkletter v. Walker, Id. at 627, 85 S.Ct. 1731, 14 L.Ed.2d at 607; H. Schwartz, Retroactivity, Reliability, and Due Process: A Reply to Professor Mishkin, 33 U.Chi.L.Rev. 719, 762–64 (1966). As pointed out in Note, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L.J. 907, 912–15 (1962), this view dates back to Chief Justice Marshall's opinion in United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801).

inet. Appellant was arrested in the living room not within reach of the kitchen cabinet. These three marijuana cigarettes were admitted at trial over the objection of counsel, and formed the basis for the charge of possession of marijuana on December 10.

Because the extent of the search violated the provisions of the fourth amendment, the admission of this evidence was error, and requires the reversal of the count of possession on December 10.[29]

We believe that the marijuana in the toothbrush container, which had been obtained by a prohibited search and seizure, was material evidence which might have led to appellant's conviction on the counts of possession and sale of marijuana on December 3. The thrust of the prosecution's case against appellant was to link him with the activities of his roommate. During the trial much of the testimony was in substantial conflict.

Sherri Meachem testified on direct examination that on the sixth of December Hastings and appellant came to her apartment and smoked some marijuana. However, on cross-examination she admitted that in her police statement she had stated that she didn't know if they had marijuana that night or not. On direct examination Meachem said that appellant had set the price of the marijuana to be sold on the 3rd; yet on cross-examination she said that Hastings set the price at $10. Then on redirect she again reversed her story. She was further impeached as to the time they met at the bowling alley, and was also impeached as to whether appellant said anything to her at the time of the sale or whether Hastings did the talking. She ad-

mitted that Hastings handed her the package but claimed appellant handed the package to Hastings first.

The testimony of Jim Hastings, appellant's roommate and accomplice, was denied by appellant, who claimed that Hastings was solely responsible for the sale. It was admitted that appellant owned no marijuana other than the three cigarettes in the toothbrush container. It was also admitted that appellant made no sales of marijuana other than his participation in the sale of December 3. It is curious that the state in the exercise of its prosecutive discretion allowed Hastings, an admitted marijuana dealer in Juneau, to plead guilty and serve 60 days in jail. On the other hand, the state sought a life sentence for appellant, whose involvement in the marijuana traffic in Juneau was minimal. From the record it is obvious that Hastings was the prime mover in the transaction of December 3. An accomplice's testimony is viewed with distrust, because the accomplice usually believes he has a personal interest in aiding the prosecution.[30]

Mere presence at the place of a crime is not usually a criminal act. Because in this case evidence of appellant's participation in the sale was in conflict, a jury sitting on the case could have been influenced by the fact that the police found marijuana in appellant's apartment which evidently belonged to him. This was the first evidence that appellant owned any marijuana. The fact that he owned marijuana at the time of these transactions and kept it in his apartment could have made his participation in the sale of December 3 more believable. His ownership of marijuana would tend to connect him more with

29. Certain other evidence found in appellant's apartment was seized at the time of arrest. These items were properly admitted, because they were in plain view as the officers walked into the room; they were not the product of a search.

30. This policy is embodied in AS 12.45.-020:

A conviction shall not be had on the testimony of an accomplice unless it is corroborated by other evidence which tends to connect the defendant with the commission of the crime; and the corroboration is not sufficient if it merely shows the commission of the crime or the circumstances of the commission.

the dealings of his roommate. Because the introduction into evidence of the three marijuana cigarettes violated appellant's rights under the fourth amendment of the United States Constitution, we are bound to apply the harmless error test enunciated in Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. ·824, 17 L.Ed.2d 705, 710–711 (1967). In cases involving federal constitutional errors state courts have no choice or discretion in deciding what standard will be applied to judge the effect of the erroneously admitted evidence.[31] The United States Supreme Court in *Chapman* required state courts to find a federal constitutional error harmless, only if the court was convinced beyond a reasonable doubt that the error did not affect the jury's determination. Applying this test to the present case we cannot say beyond a reasonable doubt that the erroneously admitted evidence did not affect the jury's determination on all three of the counts.

Throughout the dissent of Chief Justice Nesbett, there lies implicit the assumption that the appellant is guilty. In a recent United States Supreme Court case, where the evidence of guilt was virtually uncontradicted,[32] a similar dissenting view was expressed about the application of the *Chapman* test. Mr. Justice Stewart replying for the majority states:

> It is suggested in dissent that "[e]ven assuming * * * that there was no consent to search and that the rifle * * * should not have been admitted into evidence, * * * the conviction should stand." This suggestion seems to rest on the "horrible" facts of the

case, and the assumption that the petitioner was guilty. But it is not the function of this Court to determine innocence or guilt, much less to apply our own subjective notions of justice. Our duty is to uphold the Constitution of the United States.

*Id.* at 550, 88 S.Ct., at 1792, 20 L.Ed.2d at 803 n. 16. Unlike the *Bumper* case, in the present case, as we have indicated, there were substantial conflicts in the testimony at trial. Appellant took the stand and offered an explanation for the events which was consistent with his innocence. For these reasons we find we must reverse appellant's convictions on all three counts and remand for a new trial.

By virtue of our holding that reversible error was committed by the trial court, it is now unnecessary to discuss the other issues raised by appellant.

The judgment below is reversed and remanded.

RABINOWITZ, Justice, (concurring).

I agree that *Chimel*[1] requires the holding that appellant's Fourth Amendment rights were abridged by the actions of the Juneau law enforcement authorities in conducting a warrantless search of the apartment in question and their seizure of three marijuana cigarettes. The Supremacy Clause of the United States Constitution binds us to apply *Chapman's*[2] harmless-constitutional-error rule. Thus, the pivotal question before us is whether " 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' "[3]

---

31. *See* Love v. State, 457 P.2d 622 (Alaska, Aug. 8, 1969).

32. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In Bumper the prosecution's case rested on the testimony of the two victims both of whom positively identified the defendant as the perpetrator of the rape and armed assault. The defendant offered no evidence at all.

1. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

2. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, 710–711 (1967).

3. *Id.* at 23, 87 S.Ct. at 827, 17 L.Ed.2d at 710, quoting from Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171, 173 (1963).

Before the trial court's admission of the three marijuana cigarettes can be held harmless, this court "must be able to declare a belief that it was harmless beyond a reasonable doubt."[4]

Assuming no change is imminent in the federal rule as presently formulated, then in most factual situations I can perceive no real distinction between the federal automatic reversal rule for errors of constitutional dimensions and the harmless-constitutional-error rule adopted in *Chapman*. I read *Chapman* as fashioning a rigorous test of harmlessness which approximates in its stringency the very rule it purports to supplant.

Application of *Chapman* to the facts appearing in this record and in particular to the legal issue of whether appellant's convictions of possession and sale to a minor on December 3 were lawful requires reference to Justice Harlan's concurrence in Bumper v. North Carolina.[5] In this particularly relevant opinion, Justice Harlan said:

> In determining whether a criminal defendant was convicted "according to law," the test is not and cannot be simply whether this Court finds credible the evidence against him. Crediting or discrediting evidence is the function of the trier of fact, in this case a jury. The jury's verdict is a lawful verdict, however, only if it is based upon evidence constitutionally admissible. When it is not, as it is not here, reversal rests on the oldest and most fundamental principle of our criminal jurisprudence— that a defendant is entitled to put the prosecution to its lawful proof.[6]

In this same opinion Justice Harlan more precisely articulated the contours of the *Chapman* harmless-constitutional-error rule in the following manner:

> But the question cannot be whether, in the view of this Court, the defendant

actually committed the crimes charged, so that the error was "harmless" in the sense that petitioner got what he deserved. The question is whether the error was such that it cannot be said that petitioner's guilt was adjudicated on the basis of constitutionally admissible evidence, which means, in this case, whether the properly admissible evidence was such that the improper admission of the gun could not have affected the result.[7]

Similarly, in the case at bar the controlling test is not whether we, at the appellate level, choose to disbelieve appellant or find the prosecution's witnesses more believeable. Equally irrelevant are our individual impressions concerning appellant's guilt or innocence, that the appellant has in fact a prior criminal record, or that a retrial will be costly to the state and carries with it the possibility that evidence will have been lost in the interim or has become more difficult to marshall. These latter factors involve policy considerations which were resolved by *Chapman's* harmless-constitutional-error rule and now lie beyond the reach of independent examination by the judiciaries of the states. Prior conviction of crime is not substantive evidence of guilt. This impeachment evidence, as well as belief in the accused's guilt, have diminished relevancy, if any relevance at all, given *Chapman's* test of harmlessness beyond a reasonable doubt. In short, I cannot find beyond a reasonable doubt that the state's use of the three illegally seized marijuana cigarettes did not possibly affect the jury's verdicts relating to the December 3 possession and sale charges. I therefore concur in the court's reversal of these two counts and am in agreement with all other aspects of the majority's opinion.

4. *Id.* at 24, 87 S.Ct., at 828, 17 L.Ed.2d at 711.

5. 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

6. *Id.* at 552, 88 S.Ct., at 1793, 20 L.Ed.2d at 804.

7. *Id.* at 553, 88 S.Ct., at 1794, 20 L.Ed.2d at 805.

NESBETT, Chief Justice (dissenting in part).

I agree that the search of appellant's apartment without a warrant on December 10, 1967, must be held to be invalid under Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, decided by the Supreme Court of the United States in June of 1969. The three marijuana cigarettes which were found during the illegal search must be suppressed as evidence. Without the marijuana as evidence it is unlikely that the charge can be proved on a retrial in which case it will be necessary to dismiss.

However, the fact that appellant's conviction of the offense of possession of marijuana on December 10, 1967 must be set aside does not, in my opinion, justify reversing appellant's convictions of possession of marijuana on December 3, 1967, and of selling marijuana to a minor on that date, as the majority has done.

We are concerned with a man 41 years of age who took a leading part in effecting a sale of marijuana to a 16 year old Juneau girl. By his own testimony the appellant Fresneda established that he had been convicted of possession of marijuana in Los Angeles in 1950, plead guilty to possession of marijuana in Nevada in 1953 for which offense he was sentenced by a federal court to serve four years in prison, was again convicted of possession of marijuana in 1958, had two drunk driving convictions, two or three drunk convictions, one joy riding conviction, and one conviction of falsification of police records on his criminal record.

The facts upon which the jury convicted appellant of the sale of marijuana to Sherri Meacham on December 3, 1967, and of possession of marijuana on that date, were clearly delineated in the testimony and occurred a full week prior to the search. The jury had before it the testimony of James Hastings, appellant's accomplice, who had plead guilty and had been sentenced, of Sherri Meacham, Sergeant Cunningham, Chief of Police Wellington, Lieutenant Ciraulo, and Rodney Pieren. The only real conflict in the testimony was that created when appellant testified that all of the above witnesses, with the possible exception of the police officers, were lying.

The main thrust of the state's case was that of proving that appellant was illegally in possession of marijuana on December 3, 1967, and that on that date he sold the marijuana to Sherri Meacham. These two offenses were charged in separate counts of the indictment. In a third and unrelated count of the indictment, appellant was charged with the illegal possession of marijuana on December 10, 1967. The latter offense was separated a week in time from the December 3 offenses, occurred at a different location in the city of Juneau, and was proved by evidence which necessarily related to a different time and place. The jury made separate findings as to each alleged offense as it was instructed to do by the court.

There is no reason presented by the record in this case to doubt that the jury followed its instructions and reached its verdict on each separate count of the indictment on the evidence which pertained solely to that count. Nevertheless, and in spite of the fact that there is nothing in the record to indicate any irregularity in the jury function, the majority equivocates and says: "We cannot say beyond a reasonable doubt that the introduction of the marijuana found in appellant's apartment did not affect the jury's determination of his guilt on the other two counts." The result of the majority's holding is that appellant's convictions on all three counts are to be reversed and a new trial ordered. Almost two years after the original trial, the state must now attempt to locate and produce for another trial all of the six key witnesses. If the state is unable to produce certain key witnesses it may become necessary to dismiss the charges. Even if the necessary witnesses are located

and produced the second trial will have been had only at great and unnecessary expense to the state.

Again, the observations of Professor Wigmore, made in connection with a discussion of the propensity of some courts to order new trials on technicalities seems applicable:

> While on the one hand certain fundamental ideals of political liberty have come to be lightly questioned as impracticable or cynically ignored as obsolete, on the other hand the constitutional safeguards of procedure and evidence are invoked with such fatuous philanthropy and such misplaced magnanimity that their respect is lowered and their true purposes are defeated. 'I do not understand,' protested a great judicial interpreter of the organic law, 'that the Constitution is an instrument to play fast and loose with in criminal cases, anymore than in any other; or that it is the business of Courts to be astute in the discovery of technical difficulties in the punishment of parties for their criminal conduct.' Cooley, J. in People v. Murray, 52 Mich. [288] 291 [17 N.W. 843] (1883). Yet they seem to make it their business. A false sentiment misapplies their energies. This they must unlearn. The epoch of governmental oppression has passed away; the epoch of individualistic anarchy has taken its place. They must learn the lesson of transferring the emphasis of their sympathies,—a lesson more than once read to them by the voices of their own fellow-members of the judiciary. (Citing authorities) * * *.

This much has to be said here, in order to redeem the law of Evidence from that reproach which belongs rather to the law of new trials.[1]

No principle of justice or reason in logic requires that convictions based upon the events of December 3 be set aside merely because the offense of December 10 was proved by marijuana seized in a search which must now be held to be illegal.[2] True, the search of December 10 caused to be placed before the jury three marijuana cigarettes which belonged to appellant. But it was also quite clearly established by the independent testimony of four witnesses, contradicted only by the testimony of appellant, that he had a week previously taken a leading role in arranging a rendezvous with Sherri Meacham at a bowling alley, had rolled and wrapped the three marijuana cigarettes which he assisted in delivering to her at the bowling alley, and had helped his accomplice Hastings to spend the $10 received from the sale. To presume, under this state of evidence, that the jury was so impressed with the fact that three marijuana cigarettes were found in appellant's apartment on December 10 that it could have found him guilty of possession and sale of marijuana on December 3, when it otherwise might have acquitted him, is unrealistic and carries to an impractical extreme the concern which the law should observe for the rights of one who has been convicted of separate and independent crimes upon substantial evidence.

The average juror is intelligent and conscientious. Our entire jury function operates on the assumption that the jurors will follow the instructions of the court. Since

---

1. 1 Wigmore, Evidence § 21, at 375 (3d ed. 1940).

2. The December 10 search was no doubt a legal search under the holdings of the United States Supreme Court in United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950) and Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) then in force. See pages 141–143 of the majority opinion. However, since the United States Supreme Court had restricted the permissible area of a warrantless search in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, which was decided on June 23, 1969, and before our decision in this case had been published, we are required to apply the new search standards of Chimel to a search which occurred almost two years ago.

there is no basis in the record for a presumption that the jury confused the events or transposed evidence in reaching its separate verdicts it must be trusted to have performed its function according to its directive from the court.

I would affirm the convictions based on the events of December 3, 1967.

Addendum to dissent.

In a reply to this dissent, inserted on the last page of its decision, 145, the majority points out that under the rule announced by the Supreme Court of the United States in Chapman v. California[1] this court held that a federal constitutional error is harmless, only if the court is convinced beyond a reasonable doubt that the error did not affect the jury's determination. The majority then reiterates its conclusion that it cannot say beyond a reasonable doubt that the admission of the evidence did not affect the jury's determination on all three of the counts.

No discussion of the facts in relation to the rule is supplied which would explain how the majority arrived at its conclusion. As a result, the benefit of the judicial reasoning which the majority engaged in before reaching its conclusion is denied to the courts, the bar, and the public as a future guide in similar cases.

However, as support for its bare conclusion the majority quotes a portion of the majority opinion of the United States Supreme Court in Bumper v. North Carolina.[2] In my opinion, *Bumper* is not relevant. In *Bumper* the rifle obtained by the illegal search was used in the commission of the crime of rape and of both felonious assaults. The rifle was the means by which the defendant was able to commit the crimes. All of the crimes were committed within the period of an hour and a half on the same night and with respect to the same victims. In committing the crime of rape the rifle was used to hold the boyfriend at bay while the girl was forced to undress and submit. The rifle was then used to fire bullets into both of their bodies. The bullets were proven to have been fired from the rifle obtained by the illegal search. In short, the rifle was such an integral part of the evidence needed to convict *on each count* that the application of the rule of reasonable doubt could be easily understood by a reader of the opinion.

In the case before us the crimes of possession and sale of marijuana to a minor on December 3 were separated in time by a week from the crime of possession committed on December 10. No error exists with relation to any of the evidence admitted to prove the December 3 offenses. The offenses of December 3 occurred at a different location and were proved by different testimony. The marijuana obtained in the search on December 10 was not used as evidence in proving the crimes of December 3. The jury made separate and distinct findings with respect to each offense. There is nothing in the record to indicate that the jury did not follow its instructions from the court and consider only the evidence applicable to each count in arriving at its verdict as to each count. The jury was instructed that it could not make a finding of guilt unless it was convinced of guilt beyond a reasonable doubt. The majority of this court now finds, in effect, that it is not convinced beyond a reasonable doubt that the jury did not confuse, transpose, or misapply the evidence relating to the separate dates and furnishes no explanation of the basis for its doubt. I think the statement of United States Circuit Judge Warren Burger, now Chief Justice Burger, in his dissent in Pea v. United States[3] when he said that:

1. 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, 710–711 (1967).

2. 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

3. 130 U.S.App.D.C. 66, 397 F.2d 627, 640 (1967).

\* \* \* juries are to be trusted as much when they return verdicts of guilty as when they set an accused free. Jurors do not need judges to act *in loco parentis.*

is peculiarly applicable to the matter before this court.

The majority emphasizes the fact that appellant took the stand and offered an explanation for the events which was consistent with his innocence. His explanations, to a large extent, consisted of denials of the affirmative testimony against him and the claim that the witnesses were lying. The jury obviously placed no credence in his explanations and denials or it would have acquitted him. There is no justification for speculating that the jury disbelieved appellant solely because the marijuana revealed by the search destroyed his credibility when he voluntarily took the witness stand and established by his own testimony that he was a three time loser in the courts on marijuana charges during the preceding 18 years.